**Dossie Wayne KEMP et al., Appellants,**

**v.**

**Leroy BEASLEY et al., Appellees.**

**No. 18050.**

United States Court of Appeals
Eighth Circuit.

Oct. 27, 1965.

Derrick A. Bell, Jr., New York City, made argument for appellants and filed brief with George Howard, Jr., Pine Bluff, Ark., and John W. Walker, Little Rock, Ark.

Herschel H. Friday, Little Rock, Ark., made argument for appellees and filed brief with Robert V. Light, Little Rock, Ark., and William I. Prewett, El Dorado, Ark.

Before MATTHES and GIBSON, Circuit Judges, and LARSON, District Judge.

GIBSON, Circuit Judge.

This appeal from the United States District Court for the Western District

of Arkansas challenges an amended and substituted desegregation plan submitted by the school district of El Dorado, Arkansas, and approved by the District Court.

The appellants plaintiffs below (hereinafter referred as plaintiffs) are Negro children living in and attending school in El Dorado School District Number 15. This action was brought by their parents as next friends and was prosecuted as a class action purporting to represent all the Negro school children of the school district. Defendants below are the Board of Directors of the El Dorado School District Number 15, the Superintendent of the School District, and the School District as a corporate entity, and will be referred to hereafter as the Board.

Prior to and including the 1964–65 school year it was the practice of the District of El Dorado, Arkansas to operate a racially segregated school system. The white children of the community were assigned to all-white schools and the Negro children were assigned to all-Negro schools. The white schools were staffed by white teachers and the Negro schools by Negro teachers. The District also operated a racially segregated school bus system.

The El Dorado School District serves approximately 5,000 white and 2,200 Negro pupils. The system has two senior high schools, one for Negroes and one for whites. There are two junior high schools serving white students and one junior high for Negroes. Of the thirteen elementary schools seven are for whites and six are for Negroes. The system employs 314 teachers, 232 of which are white and 82 are Negro.

Both Negro and white schools are operating at less than capacity enrollment. There is some, but not a large difference in the pupil-teacher ratio between white and Negro schools. All of the Negro and white schools are fully and equally accredited, and the Negro and white teachers are on the same salary scale. It should be pointed out, however, that there is a larger percentage of white teachers with masters degrees, and the white high

school offers the student a considerably broader curriculum than does the Negro high school.

All of the schools have in practice been operated on a completely segregated basis with apparent dual attendance zones.

Prior to the 1964–65 school year plaintiffs below made application to the school district for transfer from their Negro school to a white school. This request was denied. Thereafter, plaintiffs instituted this action in the Federal District Court seeking injunctive relief from this discrimination.

Following the first hearing of this case in January 1965 the trial court found that plaintiffs were entitled to relief and directed the defendants to eliminate segregation with all deliberate speed. The Court then granted defendants the right to present a plan for desegregation to the Court. A plan was duly presented to the Court, but was subsequently revised and later further amendments were added, each time making the plan more liberal. In a decree dated April 29, 1965 this revised and amended plan was approved by the trial court over objection by the plaintiffs. Plaintiffs now appeal to this Court seeking a reversal of the decree approving this plan.

The Amended and Substituted Plan for desegregation as approved by the trial court does not contemplate that the school board will on its own motion assign any Negro children to presently all-white schools or any white children to presently all-Negro schools; nor does it set up any fixed attendance areas based upon residence. Rather the School Board plans to eliminate segregation by giving students of both races an opportunity to express, through choice of their parents, schools which they desire to attend. Proper expression of this choice will be honored as a matter of course unless to honor all of such expressions would result in overcrowding of particular schools. In the event of overcrowding a particular school, it will be solved by a nondiscriminatory means with preference to be given to the students living closest to the school. Those students rejected because

of overcrowding will be given a second choice which will be honored as a matter of course, unless, of course, the second choice school is likewise overcrowded.

The mechanics of the choice system is simple. Sometime prior to the closing of the school year, notice of the right to choose schools for the coming year will be made public. The parents of the children who are entitled to make a choice for the coming year will be supplied with an alphabetical listing of all the schools of their child's grade level. The parent will make a mark by the name of the school he desires his child to attend and will return the choice to the school board. Absent problems of overcrowding, the child will be assigned to the school of his choice.

When the plan is fully effective, 1968–69, this "freedom of choice" will not be given to the student every year. During a pupil's public school career he will be given three opportunities to choose his school. The student may pick his grade school, his junior high school, and his high school. More specifically, prior to entering the first grade, the student will be allowed to pick the grade school of his choice. Once he has made this choice he must attend this school for six years. He will not be given another choice until he enters junior high school. Then prior to entering the seventh grade the student will be allowed to choose where he wishes to attend school during his seventh, eighth, and ninth grade years. Then prior to entering high school, or the tenth grade, the student may choose his high school. This is the last of the three choices given a student and he will attend his chosen high school during the tenth, eleventh and twelfth grades.

During the transitional period if the right to state a choice is not exercised, the student will be assigned to school presently attended; but it is not clear what provision is made for students who fail or refuse to make a choice of schools, after the plan is fully effected.

This plan will not go into effect immediately. Rather, a three-step transitional period is provided. The first step,

the 1965–66 school year, students entering the first and second grades will be given their choice of schools. Next year, 1966–67, the students entering the fourth, fifth, and sixth grades will be given their choice of grade schools, as will the entering first graders. Students in the second and third grades had been given their choice the year before and will not be given another choice at this stage. The last step, the 1967–68 school year, will give a "freedom of choice" to grades seven, eight, nine, ten, eleven and twelve as well as the entering grade one. Thus at this point everyone in the system will be attending a school of his choice. Grades two, three, four, five and six will not be given a choice this year, 1967–68, but an opportunity to choose will have been made available in one of the preceding two years.

The plan will be in full operation for 1968–69 and starting with that year students entering the first, seventh and tenth grades will be given the right to attend the school of their choice, subject to overcrowding.

The plan demands a transportation system operated on a nondiscriminatory basis, but makes no provision for desegregation of the teaching staff. The plan also provides for lateral transfer of students to different schools upon the Board's own motion; or, upon request of pupil or parent "only in the event of unusual circumstances justifying the granting of such request."

Plaintiffs' dissatisfaction with this plan is two pronged. First, plaintiffs attack the whole "freedom of choice" method of desegregation. Such a system places the burden on the Negro to desegregate the system. Whereas the burden should be placed upon the school system to desegregate the schools which they have so long maintained in an unconstitutional manner.

Second, even admitting the "freedom of choice" method as constitutionally acceptable, as used in this plan it is not proper. The minimum guidelines set up by the H.E.W. department to entitle school districts to federal funds should be

strictly followed by the courts. If these guidelines are not followed, the reluctant school distict is rewarded for its failure to promptly act under its own initiative. The specific objections or points in which this plan fails to measure up to the H.E.W. standards are as follows:

1. The transitional period does not take enough grades initially. Not only should the two lower grades be given the "freedom of choice," but this freedom should have been extended to the last two grades, with a total of at least four grades every year being given the choice. Failure to do this condemns many to completing their school career in a segregated school.

2. Once in full operation the plan should provide for a "freedom of choice" at least every year. There is a natural reluctance of Negro parents to make the immediate decision to send their children to a strange school. The failure to make this choice the first year condemns the child for six years in grade school and three years in Junior and Senior High School.

3. The plan should contain a provision for desegregation of the teaching staff. This problem should not be allowed to "take care of itself."

Two basic issues are before the Court in this case. One, will the plan approved by the lower court, in its transitional and fully operative stages, deprive plaintiffs of the equal protection of the laws? Two, does the plan deprive plaintiffs, as individuals or as a class, of this equal protection because the plan does not move with the required "deliberate speed"?

■ At the outset it is clear that plaintiffs will be deprived of equal protection of the laws as guaranteed by the Fourteenth Amendment to the Constitution if they are not allowed to attend schools on a nonsegregated basis. As stated in the first Brown opinion, Brown v. Board of Education of Topeka, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954):

"Such an opportunity, (education) where the state has undertaken to provide it, is a right which must be available to all on equal terms."

■ In examining school board plans to determine whether or not education is actually being made "available to all on equal terms" a number of factors must be carefully examined. Plaintiffs argue that plans which fail to meet the minimum guideline regulations promulgated by the Office of Education, Department of Health, Education and Welfare in implementing the declaration of policy contained in § 2000d of the Civil Rights Act of 1964 should not receive Court approval. The Court agrees that these standards must be heavily relied upon to determine what desegregation plans effectively eliminate discrimination. However, we do not believe that these executive pronouncements should be conclusive upon the courts.

The Fifth Circuit, in Singleton v. Jackson Municipal Separate School District, 348 F.2d 729 (1965), attached great weight to the standards established by the Office of Education, while recognizing that the judiciary has functions and duties distinct from those of the executive department and that the matter of school administration properly rests in the executive department and further that the executive department should lead the way in dealing with administrative difficulties inherent in school desegregation plans. Judge Wisdom sounds the caveat of the courts' approving desegregation plans substantially less burdensome than those announced by the H.E.W. by stating in Singleton:

"If in some district courts judicial guides for approval of a school desegregation plan are more acceptable to the community or substantially less burdensome than H.E.W. guides, school boards may turn to the federal courts as a means of circumventing the H.E.W. requirements for financial aid. Instead of a uniform policy relatively easy to administer, both the courts and the Office of Education would have to struggle with individual school systems on ad hoc

basis. If judicial standards are lower, than H.E.W. standards recalcitrant school boards in effect will receive a premium for recalcitrance; the more the intransigence, the bigger the bonus."

 While this argument for high and uniform standards should be kept in mind by the courts, we are not in complete agreement with the conclusion of the Fifth Circuit. It is for the courts, and the courts alone, to determine when the operation of a school system violates rights guaranteed by the Constitution. The constitutional right of plaintiffs to attend a nonsegregated school is not dependent upon federally financed programs, but is an inherent right that is completely separate and apart from the executive function of regulating and financing schools. Furthermore, we feel that the regulations themselves contemplate judicial acceptance of something which differs from the executive guidelines. By allowing acceptance of a court approved plan in lieu of one approved by the Department of Education, the regulations recognize the need for day-by-day and case-by-case flexibility that can be supplied by the Federal courts sitting in the various districts.

Therefore, to the end of promoting a degree of uniformity and discouraging reluctant school boards from reaping a benefit from their reluctance the courts should endeavor to model their standards after those promulgated by the executive. They are not bound, however, and when circumstances dictate, the courts may require something more, less or different from the H.E.W. guidelines.

### Speed of the Plan

The first basic issue to be determined is whether or not the plan is moving forward with appropriate speed. We feel it is not. It is our opinion that the Board has not affirmatively performed its duty to provide a system of non-segregated schools as required by the Equal Protection Clause of the Fourteenth Amendment with "good faith compliance at the earliest practicable date" and with "all deliberate speed" as required by the second Brown decision, 349 U.S. 294, 75 S. Ct. 753, 99 L.Ed. 1083 (1955).

 The Supreme Court in refusing to countenance delay in the Little Rock, Arkansas school desegregation matter because of tension, bedlam, chaos, and turmoil in the schools in Cooper v. Aaron, 358 U.S. 1, 7, 78 S.Ct. 1401, 1404, 3 L.Ed. 2d 5, 10 (1958) (affirming 257 F.2d 33 (8 Cir. 1958)), over seven years ago used the following significant language:

" * * * Of course, in many locations obedience to the duty of desegregation would require immediate general admission of Negro children, otherwise qualified as students for their appropriate classes, at particular schools. On the other hand, a District Court, after analysis of the relevant factors (which, of course, excludes hostility to racial desegregation), might conclude that justification existed for not requiring the present nonsegregated admission of *all* qualified Negro children. In such circumstances, however, the courts should scrutinize the program of the school authorities to make sure that they had *developed arrangements pointed toward the earliest practicable completion of desegregation,* and had taken appropriate steps to put their program into effective operation. *It was made plain that delay of any guise in order to deny the constitutional rights of Negro children could not be countenanced, and that only a prompt start, diligently and earnestly pursued, to eliminate racial segregation from the public schools could constitute good faith compliance.*" (Emphasis added)

The Board's conduct and action, or rather lack of action, in the light of the above pronouncement leaves no basis for argument that an adequate plan for the operation of a racially nondiscriminatory school system must be put into effect at once, although a relatively short transitional period can be utilized, provided the interim steps taken are meaningful and

productive in effectuating a desegregated school system.

■ With this in mind a transitional period of three years in which a completely nonsegregated school system will be initiated is not unreasonable. As we said in Rogers v. Paul, 345 F.2d 117, 121 (8th Cir. 1965), "Since Brown the time available for making the transition from a segregated to a desegregated school system has decreased and the emphasis on local problems has been reduced", and mindful of the H.E.W. guidelines, we hold that the plan must be in complete operation by the 1967–68 school year.

■ Even though a three-year transitional period is permissible, as proposed in this case, it results in an unreasonable denial of equal protection to a large number of plaintiffs and should not have been approved. The plan as now constituted will not allow an elimination of segregation in the senior high schools until 1967. Meanwhile, two grades of students will graduate from high school before the plan gives them the opportunity to attend a nonsegregated school. Under the plan students now attending the eleventh and twelfth grades will be condemned to complete their education, as in the past, in segregated schools. This we feel is unwarranted and should have been eliminated by the plan.

■ The time for delay of individual rights is past. Any administrative problems that arise from this rapid transition could have been handled gradually during the more than a decade that has elapsed since Brown. The Board, however, decided to wait until the last possible minute to comply with the well-known dictate of this case. At this late date the administrative problems of the Board may not be used as a tool to deprive individuals of their long denied right to attend nonsegregated schools. If the Board feels it is necessary to require any individual to complete his education in a segregated school it must prove its justification for so doing. Here the Board has advanced no reason or purpose for denying students in the last years of their education the right to complete this education on a nondiscriminatory basis. Therefore, we find that the plan must provide students now attending the eleventh and twelfth grades the right to complete their schooling in a nonsegregated school.

■ Therefore, in addition to the integration of the first two grades, the plan must provide for immediate integration of the last two grades of high school. After integration of these four grades, the 1966–67 school year should find integration of at least four more grades, with the balance of the grades being desegregated by the 1967–68 school year.

### Mechanics of the Plan

·The issue of the acceptability of the mechanics of the plan now presents itself. It is the opinion of the Court that the plan as approved by the trial court has serious constitutional difficulties.

As previously outlined, the plan is known generally as the "freedom of choice" method. This entire system for elimination of segregation has met with plaintiffs' objection. The "freedom of choice" plan does place some burden, as recognized by the District Court, on the Negro parents and pupils. It is a plan, however, that has received judicial and executive sanction.

The Supreme Court in Goss v. Board of Education, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963), while disapproving a limited "freedom of choice" plan which allowed white or Negro children to choose segregation outside of their district, did indicate that if the transfer provisions were unrestricted allowing transfers to or from any school regardless of the race of the majority therein that the decision would be otherwise. The Fourth Circuit also afforded recognition to the "freedom of choice" in Bradley v. School Board of City of Richmond, 345 F.2d 310 (1965). "Freedom of choice" is likewise one of the accepted methods of desegregation under the H.E.W. regulations.

Even though the "freedom of choice" has been recognized by the H.E.W. regu-

lations as one method of achieving integration and has also been recognized and approved by some court decisions, it is still only in the experimental stage and it has not yet been demonstrated that such a method will fully implement the decision of Brown and subsequent cases and the legislative declaration of § 2000d of the Civil Rights Act of 1964. Both decisional and statutory law positively and affirmatively call for school districts set up on a racially nondiscriminatory basis. The "freedom of choice" plan is treated in the Bradley dissent, supra, as "only an interim measure, the adequacy of which is unknown." However, since this method could prove practical in achieving the goal of a nonsegregated school system, it should be allowed to demonstrate its efficacy to afford the constitutional guarantees which plaintiffs are entitled to as a matter of right. We, therefore, find that the "freedom of choice" plan is a permissible method at this stage.

Although the "freedom of choice" method is generally acceptable, as used in the plan approved by the trial court, it has fatal faults. These faults in our opinion deprive plaintiffs of their constitutional rights to equal protection of the laws. The plan as set up provides that a failure to make a choice when given the chance during the three-step transitional period results in the student being assigned to the school that he previously attended. No provision is made for failure to choose under the fully operative plan. Since the schools have been operating with dual attendance zones based upon race, the failure to make a choice results in the student being assigned to a segregated school. The dual attendance zones have not been eliminated by the plan. Although a provision is made for students to escape from the segregated school, the dual attendance area, segregated school system is kept in operation. To illustrate, the present plan has resulted, according to the Board, in only four Negroes enrolling in the first grade, and seven in the second grade in previously all-white classes. The balance, which includes the great majority of the Negroes,

attend all-Negro schools as before. This constitutes only tardy and inadequate recognition of constitutional rights and must be remedied by an elimination of the existing dual attendance areas for children who fail to exercise a choice.

It is not open to serious question that dual zoning of school districts is a violation of the Constitution. Any school system practicing segregation by the use of dual attendance zones based upon race is discriminatory and certainly does not comport with the requirements of Brown. As reviewed in Downs v. Board of Education of Kansas City, 336 F.2d 988, 995 (10 Cir. 1964) (cert. denied 380 U.S. 914, 85 S.Ct. 898, 13 L.Ed.2d 800) "There cannot be full compliance with these constitutional requirements until all dual school systems based upon race or color have been eliminated. Ross v. Dyer, 5 Cir., 312 F.2d 191; Augustus v. Board of Public Instruction, 5 Cir., 306 F.2d 862." For a like holding see, Bradley v. School Board of the City of Richmond, supra.

In support of their "freedom of choice" plan the Board places great reliance in the dicta found in Briggs v. Elliott, 132 F.Supp. 776, 777 (E.D.S.C. 1955) to the effect "the Constitution, in other words, does not require integration. It merely forbids discrimination." Therefore, they argue that as long as the Negro is not required to attend the Negro school his constitutional rights have not been violated.

We cannot accept the position advanced by the Board on this matter. The dictum in Briggs has not been followed or adopted by this Circuit and it is logically inconsistent with Brown and subsequent decisional law on this subject. This well-known dictum may be applicable in some logical areas where geographic zones permit of themselves without discrimination a segregated school system, but must be equally inapplicable if applied to school systems where the geographic or attendance zones are bi-racially populated. Any school system admittedly practicing segregation by the use of dual attendance zones based upon race is discriminatory

and certainly does not comport with the requirements of Brown.

 The H.E.W. guidelines clearly provide that in the "freedom of choice" plans, "(i)f no choice is made, they shall be assigned to the school nearest their homes or on the basis of nonracial attendance zones."[1] It is the opinion of the Court that the failure of the plan to provide some nonracial basis for assignment if the "freedom of choice" is not exercised is fatal to the plan. The continuation of the dual attendance areas wherein whites are required to attend all-white schools and Negroes are required to attend all-Negro schools should they fail to elect otherwise is unconstitutional and must be remedied.

The plan as it now stands provides for only three opportunities for the student to exercise his freedom of choice. The Court is in agreement with the plaintiffs and the H.E.W. standards that this is insufficient. If the child or his parent is to be given a meaningful choice, this choice must be afforded annually. The initiative for desegregation has been placed by the Board in the hands of the Negro parents and students, it is only fair that once a choice is made or had not been exercised, the child not be precluded for long periods of time from changing schools.

Therefore, absent unusual and extraordinary circumstances not shown in this case, the transitional plan submitted at this comparatively late date should:

1. Integrate at least the first two grades and the last two grades by giving a meaningful bona fide "freedom of choice" to the student or his parent commencing in the 1965–66 school year;

2. Provide integration of four additional grades, preferably grades four and five, nine and ten under the same uniform nondiscriminatory conditions for the 1966–67 school year;

3. Integrate the balance of the grades in the school year 1967–68;

4. Completely eliminate bi-racial attendance zones.

After such transitional period any plan employing the "freedom of choice" alternative in conducting a nonsegregated school system should provide for desegregation in all grades together with an annual "freedom of choice" to be exercised under reasonable regulations and conditions promulgated by the Board and sufficiently publicized to acquaint all interested parties with the simple mechanics of exercising their right of choice of schools, subject, of course, to the availability of classroom facilities and the over-crowding of classrooms.

The Court is aware that consideration must be given to the availability of facilities but a refusal to honor a "freedom of choice" must be predicated on factors other than race.

Finally, the fully effective plan must elminate bi-racial attendance zones and the assignment of students to schools operated on such a segregated basis.

It is the duty of the Board to propose an acceptable plan in conformity with the view expressed herein and to fill in the details of such plan without further order from the Court. The hour is late and an adequate plan should be put into operation, not later than the beginning of the second half of the 1965–66 school year.

Plaintiffs also complain that the Court did not order faculty and staff desegregation. The Court recognizes the validity of the plaintiffs' complaint regarding the Board's failure to integrate the teaching staff. Such discrimination is proscribed by Brown and also the Civil Rights Act of 1964 and the regulations promulgated thereunder. The Court feels, however, as did the District Judge, that this is a situation which will be corrected by the Board during the transitional period. The District Court retains jurisdiction of this matter and with its equity powers may issue any order or orders necessary to bring into being a rea-

1. General Statement of Policies under Title VI of the Civil Rights Act of 1964 Respecting Desegregation of Elementary and Secondary Schools, (V, D, 3, (c)) Office of Education, Department of Health, Education and Welfare.

sonable nondiscriminatory policy of employment of teachers without regard to race.

### Attorney Fees

■ The plaintiffs' claim for attorney fees is a matter that rests in the discretion of the trial judge. They cite in support of their claim the Civil Rights Act of 1964, which specifically allows attorney's fees in cases filed to redress discrimination in Public Accommodation actions. This Act provides no legal basis for attorney's fees in school segregation cases. Congress by specifically authorizing attorney's fees in Public Accommodation cases and not making allowance in school segregation cases clearly indicated that insofar as the Civil Rights Act is concerned, it does not authorize the sanction of legal fees in this type of action. The doctrine of *Expressio unius est exclusio alterius* applies here and is dispositive of this contention.

■ Ordinarily for the Court to allow attorney's fees, the same must be predicated upon either contract or statutory authorization. There are exceptions to the rule, mainly applied in fiduciary relationships. The Court would have the power sitting as a court of equity to impose sanctions necessary to effectuate its decrees and to punish conduct and tactics of parties that are discreditable as was done in Bell v. School Board of Powhatan, 321 F.2d 494 (4th Cir. 1963). A token fee of $75 was allowed and affirmed in Bradley v. The School Board of the City of Richmond, 345 F.2d 310, 321 (4th Cir. 1965), the Court there stating:

"It is only in the extraordinary case[s] that such an award of attorneys' fees is requisite * * * Attorneys' fees are appropriate only when it is found that the bringing of the action should have been unnecessary and was compelled by the school board's unreasonable, obdurate obstinancy. Whether or not the board's prior conduct was so unreasonable in that sense was initially for the District Judge to determine. Undoubtedly he has large discretion

in that area, which an appellate court ought to overturn only in the face of compelling circumstances."

■ While this might be a case calling for the imposition of a penalty by awarding attorney's fees we do not feel that the District Judge abused his discretion in failing to so do. See, Rogers v. Paul, 345 F.2d 117 (8 Cir. 1965), in which we held that the District Court did not abuse its discretion by failing to allow an award of attorney fees in a school segregation case.

As time is of the essence in the full recognition of constitutional rights, that part of the District Court's judgment approving the amended and substituted plan is vacated and the case is remanded for proceedings consistent with this opinion. In all other respects the judgment is affirmed.

Affirmed in part, reversed in part and remanded. Let mandate issue forthwith.

LARSON, District Judge (concurring).

I concur in the disposition of this case and in Judge Gibson's opinion.

I agree that the Department of Health, Education and Welfare guidelines should be used as a point of reference in measuring the provisions of school desegregation plans. I also agree that they are not conclusive upon the courts and that we may approve something different. However, that "something different" should rarely, if ever, be less than what is contemplated by the H.E.W. standards. Rather, judicial criteria should probably be more stringent.

A school board which fails to act voluntarily forces Negro students to solicit aid from the courts. This not only shifts the burden of initiating desegregation, but inevitably means delay in taking the first step. As Judge Gibson observes, we are not here concerned with regulating the flow of Federal funds. Our task is to safeguard basic constitutional rights. Thus, our standards should be directed toward full, complete, and final realization of those rights.

**24**

Moreover, this should be accomplished immediately. The bell was tolled for segregated schools more than a decade ago, and at this late date all discriminatory systems should have been eliminated. The second Brown decision required segregation to be phased out with "all deliberate speed." After eleven years of deliberation, discussion and delay, the courts should turn a deaf ear to arguments that now is not the "earliest practicable date." Whatever administrative difficulties may have been present at the outset could have been resolved by this time if compliance had been commenced in good faith and without hesitation. Constitutional rights should no longer be permitted to remain in abeyance.