**John T. MARKS and James Ray Marks, by their father and next friend, L. T. Marks, Plaintiffs,**

v.

**The NEW EDINBURG SCHOOL DISTRICT, a public body corporate, and H. O. Splawn, Superintendent of Schools of the New Edinburg School District, Defendants.**

**No. PB 66 C–71.**

United States District Court
E. D. Arkansas,
Pine Bluff Division.

Sept. 17, 1966.

---

John W. Walker, Little Rock, Ark., Jack Greenberg, Michael Meltsner, New York City, for plaintiffs.

Robert V. Light, Smith, Williams, Friday & Bowen, Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

OREN HARRIS, District Judge.

This cause of action comes on to be heard on the merits. It was brought by the plaintiffs on behalf of themselves and all others similarly situated who are Negro students residing within the borders of the New Edinburg School District, a public school maintained for the education of students residing therein in Cleveland County, Arkansas, against the New Edinburg School District and H. O. Splawn, Jr., Superintendent of Schools. The plaintiffs appeared by their father and next friend, L. T. Marks, and Mr. John W. Walker, their attorney and the defendants appeared by H. O. Splawn Jr., Superintendent of Schools, and Mr. Robert V. Light, of the firm of Smith, Williams, Friday & Bowen, their attorney.

This is a class action to desegregate the schools of the New Edinburg School District and bring to an end racial segregation of the public schools solely because of race or color, claiming rights, privileges and immunities under the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States. Plaintiffs are students of the New Edinburg Schools.

It is alleged in the complaint filed by the plaintiff on August 30, 1966, that the defendant New Edinburg School District operates a school for white students within the district of grades one through twelve; a school for Negro students within the district of grades one through six; and requires Negro students of grades seven through twelve to attend a public school, J. E. Wallace School, outside of said district reserved and operated for the education of Negro students. It is further alleged that the school operated by defendant for Negro students is inferior to the schools operated primarily for white students.

The plaintiffs, for themselves and all others similarly situated, including those required to attend public school outside of the New Edinburg School District, seek both preliminary and permanent injunctive relief.

In 1965, the defendant school district voluntarily proposed a plan of desegregation on the basis of a so-called "free-

dom of choice" method to be implemented in three years. It proposed to effectuate the plan by desegregating four grades each year beginning with grades one through four during the 1965–66 school term; grades five through eight during the 1966–67 school term; and grades nine through twelve during the 1967–68 school term. The proposed plan was adopted in an attempt to comply with the guildelines and other requirements of the United States Office of Education, Department of Health, Education and Welfare, in order for the school district to receive federal financial assistance as provided by law.

During the 1965–66 school year, all white students were assigned by the defendant school district to the previously designated white school after an opportunity was given to express a choice of schools, and all Negro students through grades six were assigned to the previously designated all Negro school after opportunity was given to each student or the parents to express a choice of schools. The Negro students of grades seven through twelve were assigned and transported by bus to the J. E. Wallace School operated outside of the defendant school district after an opportunity was given to express a choice of schools.

As pertinent to this action, the defendant school district, by and through its superintendent, H. O. Splawn, Jr., signed a revised statement on April 15, 1966, in the nature of an assurance of compliance required by the United States Office of Education of all districts in an attempt to comply with the 1966 guidelines for the school year of 1966–67.

Also pertinent to this action, the plaintiffs and others similarly situated in the district presented on April 18, 1966, a petition to the defendant H. O. Splawn, Jr., Superintendent, purporting to express a choice to attend the predominantly white school for this year, 1966–67 school term.

Thereafter, on May 5, the defendant school district, through its superintendent, provided by mail to all students of the district in grades one through eight and their parents a choice form previously approved by the United States Office of Education purporting to give each student an expression of choice of schools to attend during the current school year 1966–67. The choice period to comply and return the proposed official choice form was thirty days, May 5 to June 4, 1966. Within the thirty days' choice period, ninety-three white students of one hundred twenty returned the forms choosing to attend the New Edinburg School. Of one hundred fourteen forms sent to Negro students, twenty returned the forms choosing to attend the New Edinburg School and twenty-one returned the forms choosing to attend either St. Paul Elementary School or J. E. Wallace School, both Negro schools. Of the twenty who expressed a desire to attend the New Edinburg School, eight voluntarily withdrew before assignments were made, and one who would be in the ninth grade not covered by the choice provisions under the plan for 1966–67 school year for desegregation of grades one through eight.

Eleven Negro students were assigned to the New Edinburg school. Two have since moved out of the district and one has dropped out of school. Eight Negro students are thus assigned to the New Edinburg School.

Also on May 4, 1966, choice forms were sent to students that would be in grades nine through twelve during the 1966–67 school year on which they could request a transfer to a school other than the one they were presently attending. One was returned by a Negro student in the eleventh grade requesting a transfer to the New Edinburg School, but the transfer was not approved.

On August 15, 1966, the defendant H. O. Splawn, Jr., transmitted a letter on behalf of the New Edinburg School District to all students and their parents advising that the Board of Directors had decided after considering all factors involved to follow the original desegregation plan of the previous year. The let-

ter was official notice that all students would be assigned to the school they attended the previous year, except the eleven Negro students who had expressed a choice to attend the New Edinburg School.

On September 8, 1966, after notice, a hearing was held on the motion for preliminary injunction. After presentation of counsel and following the testimony of Mr. H. O. Splawn, Jr., Superintendent of Schools, the court decided that there was a substantial question as to the intention of the school district on its proposed plan to desegregate the New Edinburg Schools, and whether or not the plaintiffs and others similarly situated have been given reasonable opportunity to express a bona fide choice of school. The defendants were required to file an answer by September 14, and the case set for further hearing on the merits Friday, September 16, 1966. The evidence given at the preliminary hearing would be considered by the court in passing upon the merits of the case.

The defendants filed their answer denying the allegations of the plaintiffs, denying that the plaintiffs are entitled to the relief sought and attached to the answer a copy of the district's transitional plan of desegregation approved by the New Edinburg School Board in 1965 and subsequently approved by the United States Office of Education. The defendants request the court to approve their plan of desegregation as proposed.

There are three questions of fact before the court for determination.

First, is the proposed plan of the defendant school district sufficient to comply with the requirements of law?

Second, to what extent is the defendant school district carrying out its proposed plan in good faith compliance at all deliberate speed?

Third, have the students of the defendant school district, or any number thereof, been given a reasonable opportunity of an expression of their choice to attend schools during the 1966–67 term provided for by the school district?

Since the decision of the United States Supreme Court in 1954, Brown, et al. v. Board of Education of Topeka, et al., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the rules of law applicable to desegregate public schools have become well crystallized, and before considering the facts as shown by the record in the instant case, the court feels that a restatement of these rules which must be followed in the determination of this cause of action is desirable.

Until 1954 the rule of law interpretated by the United States Supreme Court in the field of public education the doctrine of "separate but equal" had been followed as sufficient to meet the constitutional requirements under the Fourteenth Amendment to the Constitution of the United States.

In its opinion in the Brown case, supra, the Supreme Court held that "[w]e must consider public education in the light of its full development and its present place in American life throughout the Nation. Only in this way can it be determined if segregation in public schools deprives these plaintiffs of the equal protection of the laws."

The court then posed the question directly: "Does segregation of children in public schools solely on the basis of race, even though the physical facilities and other 'tangible' factors may be equal, deprive the children of the minority group of equal educational opportunities?" Answering its own question the court said: "We believe that it does." (Brown v. Board, supra) This was a new statement of policy; a new interpretation of the Fourteenth Amendment to the Constitution. This was new law.

In holding that in the field of public education the doctrine of separate but equal facilities has no place, the court said: "Separate educational facilities are inherently unequal. Therefore, we hold that the plaintiffs and others similarly situated for whom the actions have been brought are, by reason of the segregation complained of, deprived of the equal protection of the laws guaranteed by the

Fourteenth Amendment. This disposition makes unnecessary any discussion whether such segregation also violates the Due Process Clause of the Fourteenth Amendment."

In a subsequent decision the Supreme Court said: "[T]his court has recognized, discrimination may be so unjustifiable as to be violative of due process." Bolling v. Sharp, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954).

Thus the concept of equal protection and due process are not mutually conclusive although they are not always interchangeable phrases.

The bell was thus tolled for desegregation of public schools in this nation solely on the basis of race or color. It was a declared fundamental principal that racial segregation in public education is unconstitutional and "[a]ll provisions of federal, state or local law requiring or permitting such discrimination must yield to this principal". Brown v. Board of Education, 349 U.S. 294, 298, 75 S.Ct. 753, 755, 99 L.Ed. 1083 (1955). As was pointed out there remains for consideration the manner in which relief is to be accorded. It was recognized that full implementation of these constitutional principals may require solutions of varied local school problems.

It is quite significant that the Supreme Court appropriately placed responsibility on the local school districts in resolving the problems by making it abundantly clear that "[s]chool authorities have the primary responsibility for elucidating, assessing, and solving these problems".

It is equally significant that the Supreme Court further stated that the "courts will have to consider whether the action of the school authorities constitutes good faith implementation of the governing constitutional principles. Because of their proximity to local conditions and the possible need for further hearings, the courts which originally heard these cases can best perform this judicial appraisal." Brown v. Board of Education, supra.

The (District) courts are admonished to carry out this responsibility with "all deliberate speed".

While recognizing public and private considerations the courts will require prompt and reasonable start toward full compliance. Once such a start is made, additional time may be necessary to carry out the ruling in an effective manner. The burden rests upon the districts in establishing that such time is necessary in the public interest and is consistent with good faith compliance. Transitional plans are recognized as a proper method of compliance and the courts may consider various problems relative to administration. During the period of transition the court will retain jurisdiction. Brown v. Board, supra.

In recent decisions the United States Supreme Court has altered the context for implementing and effectuating racially non-discriminatory school systems. The time element since the original Brown decision has apparently motivated a change of timing in the transitional period.

While the Supreme Court again recognized the "deep-rooted problems involved" and "variety of obstacles" that would arise in the transition, the mandate in the Brown decision crouched in language with "good faith compliance at the earliest practicable date" and "all deliberate speed" should be carried out more expeditiously and with greater success. "Delays in desegregating of school systems are no longer tolerable." Bradley v. School Board of the City of Richmond, et al., 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187, 1965.

Twice in recent decisions the Supreme Court has said: "Now, however, eight years after this decree was rendered and over nine years after the first Brown decision, the context in which we must interpret and apply this language to plans for desegregation has been significantly altered." Goss v. Board of Education, 373 U.S. 683, 689, 83 S.Ct. 1405, 1409, 10 L.Ed.2d 632 (1963); Calhoun v. Latimer, 377 U.S. 263, 265, 84 S.Ct.

1235, 12 L.Ed.2d 288 (1964). It is quite apparent that "good faith compliance at the earliest practicable date" and "all deliberate speed" has taken on new meaning.

In the meantime, the Circuit Court of Appeals of the Eighth Circuit in Kemp v. Beasley, 352 F.2d 14 (1965), has outlined a general course of action for the school boards to follow in formulating an adequate plan for the operation of a racially nondiscriminatory school system.

■ The Eighth Circuit Court of Appeals has made it clear that a plan must be put into effect *'at once'* although a relatively short transitional period can be utilized if interim steps taken are "meaningful and productive" in effecting a desegregated school system.

■ A transitional period of three years is not unreasonable but must not result in an unreasonable denial of equal protection to a large number of students. No student should be condemned to complete their education as in the past in segregated schools. Any plan to the contrary would be unwarranted and insufficient.

The Eighth Circuit said the "time for delay of individual's rights is past". Administrative problems arising from rapid transition could have been handled gradually during the more than a decade since the Brown decision by the United States Supreme Court. Thus, the Eighth Circuit held that administrative problems of the board may not be used as a tool to deprive individuals of their long denied right to attend nonsegregated schools. To require otherwise, the school must prove justification for so doing.

The Eighth Circuit dealt with the mechanics for a plan of desegregation. It condones the "freedom of choice" plan even though admittedly it places some burden on Negro parents and students. "It is a plan, however, that has received judicial and executive sanction." (Kemp v. Beasley, supra.)

Even so, it is recognized as an interim measure. It has yet to demonstrate that it can and will fully implement the Supreme Court decisions and the legislative declaration of Civil Rights Act of 1964. "However, since this method could prove practical in achieving the goal of a nonsegregated school system, it should be allowed to demonstrate its efficacy to afford the constitutional guarantees which plaintiffs are entitled to as a matter of right. We, therefore, find that the 'freedom of choice' plan is a permissible method at this stage." (Kemp v. Beasley, supra.)

Then the court proceeded to point out "fatal faults" with this method, faults which deprive plaintiffs of their constitutional rights to equal protection of the laws.

The court considered the question of a 'failure to make a choice' when given the chance during the three-step transitional period resulting in the student being assigned to the school that he previously attended. The court made it clear that any plan which did not provide some method of assignment for those who failed to make a choice resulting in the student being assigned to a segregated school on the basis of race or color would be insufficient. "It is the opinion of the Court that the failure of the plan to provide some nonracial basis for assignment if the 'freedom of choice' is not exercised is fatal to the plan." (Kemp v. Beasley, supra.)

The court also considered the question of whether or not this method should provide for an annual "freedom of choice" to be exercised under reasonable regulations and conditions promulgated by the board and sufficiently publicized to acquaint all interested parties with the simple mechanics of exercising their right of choice of schools, subject to the availability of classroom facilities and the overcrowding of classrooms. "If the child or his parent is to be given a meaningful choice, this choice must be afforded annually."

The Circuit Court of Appeals (Kemp v. Beasley, supra) proceeded to outline four requirements (except for unusual and extraordinary circumstances) for the

transitional plan and method for conducting a nonsegregated school system by,

1. First two grades and last two grades for the first year by giving a meaningful bona fide freedom of choice to students or parents,

2. Grades four and five and grades nine and ten for the second year on the same basis of choice,

3. All other grades as the third step in the three years, and

4. Completely eliminate bi-racial attendance zones.

This was the court's judicial appraisal of that particular case. (Kemp v. Beasley, supra) It was an acceptable method to achieve the school board's efforts to desegregate the school system.

In another class action to desegregate the schools of Fort Smith, Arkansas, the United States Supreme Court reversed the Eighth Circuit and ordered immediate relief for senior high school students to be immediately transferred to the high school with more extensive curriculum from which they are excluded because of their race. Rogers, et al. v. Paul, et al., 382 U.S. 198, 86 S.Ct. 358, 15 L. Ed.2d 265 (1965)

 Thus, the pattern is clear and decisive. Minimum guidelines contained in regulations promulgated by the United States Office of Education in implementing the policy of desegregation under the civil rights statute should be considered by the courts in determining what desegregation plans effectively implement desegregation, but *such* executive pronouncements are not conclusive upon the courts.

It is for the courts alone to determine what operation of a school system violates constitutional rights. (Kemp v. Beasley, supra)

 Constitutional rights of children to attend a nonsegregated school is not dependent upon federally financed programs but is an inherent right that is completely separate and apart from executive function of regulating and financing of schools. While a Federal District Court after analyses of relative factors involved in school desegregation could conclude that justification existed for not requiring present nonsegregated admission of all qualified Negro childen, the court must scrutinize programs of school authorities to make sure that they had developed arrangements pointing toward early practical completion of desegregation and that they had taken appropriate steps to put the program into effective operation. (Kemp v. Beasley, supra)

It is necessary, therefore, for the court to consider the record of this case in the light of the above decisions of the Supreme Court and the Circuit Court of Appeals. The court has requested and received the views of counsel as to the effect of those decisions on this case for an orderly transition in good faith compliance.

From the evidence before it, the Court finds that the New Edinburg School District is and has been operating segregated schools in all grades within the district, and that all Negro students residing in the district who are in grades seven through twelve have been and are currently required to attend the J. E. Wallace School, which is an all-Negro school located in another school district separate and distinct from the New Edinburg School District. The Court also finds that the curriculum in the J. E. Wallace School is somewhat different and to some extent inferior to the New Edinburg School which plaintiffs and others similarly situated desire to attend.

The Court finds that under the school board's transitional plan Negro students who are presently enrolled in the twelfth grade will be required to complete their high school education at the J. E. Wallace School and will never have an opportunity to attend a desegregated public school, and the students presently enrolled in the eleventh grade would be handicapped in pursuing their high school education when they reach the twelfth grade at the beginning of the 1967–68 session.

**646**

The Court also finds that the facilities of the elementary St. Paul School are somewhat inferior to the New Edinburg Elementary School.

The school district has attempted a voluntary plan of desegregation and purported to offer a three-step freedom of choice method to the students of the district. It has thus far resulted in perfunctory compliance. There is substantial question in the opinion of the court as to whether or not there has been opportunity of bona fide choice. Certainly there has been some confusion over the method or presentation caused to some extent by the questionable interference of representatives of the United States Office of Education.

This Court is unwilling to require the district to comply with the guidelines of the Office of Education, Department of Health, Education and Welfare, although I am constrained to suggest that they should be seriously considered.

Neither is the Court willing to completely disrupt the operation of the school at this time or invoke an impossible burden on the board and officers of the school district.

Neither do I intend to condemn students in their final high school grades to complete their education as in the past in segregated schools.

■ The proposed plan of desegregation fails to meet the requirements of the law in every respect and is, therefore, insufficient. Modification will be necessary to meet the requirements of the equal protection of the laws.

Therefore, immediate relief should be provided for those high school students in the eleventh and twelfth grades being transported outside of the district to the all-Negro J. E. Wallace School.

The Court is not willing, however, to order this transfer without bona fide expression from those to be effected. An opportunity should be given to these students to express an individual choice.

An order is being entered in compliance with this decision.