Carnell GRAVES, Richard J. Graves, Vickie Ann Graves, Meredith D. Graves, Debra M. Graves, and Kevin R. Graves, minors, by their father and next friend, Floyd Graves, Plaintiffs,

v.

BOARD OF EDUCATION OF the NORTH LITTLE ROCK, ARKANSAS, SCHOOL DISTRICT, a public body corporate, and F. B. Wright, Superintendent of Schools of the North Little Rock School District, Defendants.

No. LR–68–C–151.

United States District Court
E. D. Arkansas, W. D.

April 29, 1969.

John W. Walker, Little Rock, Ark., for plaintiffs.

Robert V. Light, Little Rock, Ark., for defendants.

*Memorandum Opinion*

HENLEY, Chief Judge.

This desegregation case involves the public schools of the City of North Little Rock, Pulaski County, Arkansas. The plaintiffs are Negro school patrons of the District. The defendants are the Board of Education of the District and the Superintendent of Schools. In answer to plaintiffs' complaint the District has come forward with a desegregation plan based in part on attendance zoning and in part on freedom of choice. The plaintiffs challenge the sufficiency of the plan to discharge the District's obligation to disestablish its existing system of racially identifiable schools. Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716; Raney v. Board of Education, 391 U.S. 443, 88 S. Ct. 1697, 20 L.Ed.2d 727; Monroe v. Board of Commissioners, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733; Brown v. Board of Education, 349 U.S. 294, 75 S. Ct. 753, 99 L.Ed. 1083, and 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, 38 A.L.R.2d 1180; Cato v. Parham, 8 Cir., 403 F.2d 12, aff'g Cato v. Parham, E.D.Ark., 293 F.Supp. 1375. While the District's plan

has been approved by the Office of Education of the Department of Health, Education & Welfare, that is not dispositive of the matter; it is the function of the Court to determine whether the plan complies with constitutional standards. Kelley v. Altheimer, Ark. Public School District, 8 Cir., 378 F.2d 483; Kemp v. Beasley, 8 Cir., 352 F.2d 14.

The cause has been tried to the Court. It has been submitted on documentary material supplemented by the testimony of Assistant Superintendent of Schools, George Miller, who will become Superintendent on July 1, 1969, and it has been briefed by counsel. This memorandum incorporates the Court's findings of fact and conclusions of law.

█ By way of introduction the Court will say that consideration must be given not only to the component parts of the plan but also to the plan as a whole; and the evaluation of the plan must be in the light of ruling constitutional principles, the situation in North Little Rock, and the desegregation history of the District down to this time.

North Little Rock is a city of more than 60,000 people. It is located on the north bank of the Arkansas River directly across the stream from the City of Little Rock. The parties are in agreement that the desegregation problem in one of the two cities does not differ in principle from that which exists in the other.[1]

Both cities are part of the same metropolitan area and both have substantial Negro minorities. Residential housing in both cities is in general segregated. Schools in both cities have been constructed in accordance with the "neighborhood school" concept under which schools are located near the homes of children to be served. In recent years in both cities a migration of the white population, particularly the more afflu-

ent, has been clearly discernible. In Little Rock the migration has been in a westerly direction into and beyond the fashionable Pulaski Heights area. In North Little Rock the movement has been to the north and into the picturesque Lakewood and Indian Hills area. The Court thinks that as far as migration shifts are concerned there is perhaps one difference between Little Rock and North Little Rock to be observed. In Little Rock the westward movement of whites has been followed by a westward movement of Negroes who have acquired residences formerly occupied by white people. It does not appear that there has been a corresponding northward migration of Negroes in North Little Rock. Practically all of the North Little Rock Negroes along with many whites reside in the southern part of the city, and there are probably no Negroes in the Lakewood and Indian Hills areas.

Prior to the Brown decisions in 1954 and 1955, the District, like all other school districts in Arkansas having a racially mixed population, was required to maintain separate schools for Negro students and for white students. In accordance with the neighborhood school concept white schools were built in white neighborhoods and Negro schools were built in Negro neighborhoods. The white schools had white principals and teachers, and the Negro schools had Negro principals and teachers. In the defendant District the Superintendent of Schools and members of the administrative staff of the District have always been and still are white people. While as will be seen, the original all white school system of the District has been desegregated to some extent, the original Negro school system has not been desegregated at all as far as student bodies are concerned. For convenience the Court throughout this memorandum will refer to the formerly all white

---

1. As is well known, the Little Rock School District has been involved in desegregation litigation since 1956. Its most recent plan, based on geographical zoning, is now under consideration by District Judge Gordon E. Young, and counsel in this case filed, along with their own briefs, copies of the briefs filed by them in the Little Rock case.

schools as simply "the white schools," and to the still all Negro schools as "the Negro schools."

The present white school system consists of North Little Rock High School, Fourth Street Junior High School, Jefferson Davis Junior High School, Ridgeroad Junior High School, and 21 elementary schools named after their geographical locations or white individuals. Three of the elementary schools have been built quite recently; they are located in the northern part of the City, and their sites were located by the Board in consultation with housing developers.

The Negro school system consists of the Scipio A. Jones School, which is a combination junior-senior high school serving students in grades 7–12, and the Carver, Lincoln, Roosevelt, and Woodson Elementary Schools. With the exception of the Woodson Elementary School, the Negro schools have been named after Presidents and individuals noted for their interest in Negro aspirations.[2]

Negroes make up 22 percent of the District's elementary and high school students and 23 percent of the junior high school students. The present enrollment of the District's schools is 12,879 students; 9,990 of the students are white; 2,889 of them are Negroes.

The District's faculty consists of 577 persons. Four hundred thirty-five or 75 percent of the faculty members are white, and 142 or 25 percent are Negroes.[3] Custodial employees at all schools of the District are Negroes.

Actual desegregation of the Little Rock public schools began in 1957, but no effort was made to desegregate the North Little Rock schools until the opening of school in 1964, some ten years after *Brown I* was decided. In September 1964 eight Negro children were admitted to two of the white elementary schools.

In 1965 the District began to assign its students to schools on the basis of freedom of choice. That method brought 117 Negroes into the white schools in 1965–66; 468 were enrolled during 1966–67; the figure for 1967–68 was 625; and the current Negro enrollment in the white schools is 712. No white student has ever expressed any desire to attend a Negro school; and none has ever been assigned to such a school.

Faculty desegregation began with the 1966–67 school year and has proceeded on a small scale. At the present time there are some white teachers in all of the Negro schools and some Negro teachers in all of the white schools. As the Court analyzes Defendants' Exhibit 4, there are 43 Negro classroom teachers assigned to the white schools and 16 white classroom teachers have been assigned to the Negro schools.[4]

However, the assignments of white teachers to Negro schools and the assignments of Negro teachers to white schools appear to have been largely unrelated to the numbers of students and numbers of teachers in the respective schools to which the assignments have been made. While there are seven white teachers at the Jones School, it may be said in general with respect to other schools that teachers assigned to schools in which students of their race are in

2. Everyone is familiar with the names of President Lincoln, both Roosevelts, and George Washington Carver, the noted Negro scientist. Scipio A. Jones was a prominent Negro lawyer who practiced locally in former years.

3. From Plaintiffs' Exhibit 1, as corrected. The Court notes a slight discrepancy in the figures appearing on that exhibit. The figure "435" used in the text as indicating the number of white faculty members appears at one place on PX-1;

at another place the figure is given as "441."

4. According to PX-1 referred to previously, 23 members of the white "faculty" have been assigned to the Negro schools. The discrepancy between the figure shown in PX-1 and the more detailed figures appearing in DX-4 may be due to a difference in characterizing individuals as "teachers" or as "faculty" members. The Court has already noted a minor discrepancy in the figures appearing on PX-1.

the minority have simply been sent out "two by two" or "three by three."

By the spring of 1968 the District was having trouble with HEW about the working of freedom of choice and under pressure from HEW evolved the plan now before the Court. Essential to operation of part of the plan is use of certain new facilities description of which follows.

There are now under construction in the District two new junior high schools and one new senior high school. One of the junior high schools, to be known as the Rose City Junior High School, is being built in the Rose City area, which is in the eastern part of the City. The new high school, to be known as Northeast High School, and the other junior high school, to be called Lakewood Junior High School, are being built on a common campus in the Lakewood area, and in the evidence are at times referred to collectively as the "Northeast Complex."

The Rose City Junior High School and Northeast High School will be finished and ready for use in September of this year. Lakewood Junior High School will not be finished until several months later, perhaps not until the summer of 1970. However, the District proposes to offer instruction to 1153 students in Grades 7–10 at the Northeast Complex beginning in September. Presumably use will be made of the high school plant and perhaps of such part, if any, of the junior high school plant as may be usable by that time.

For an indefinite time in the future the District proposes to continue to assign elementary students on the basis of freedom of choice. Mr. Miller testified in that connection that the Board had considered attendance zoning and pairing of grades and schools as possible alternatives to freedom of choice but had rejected both alternatives.

Junior high school students are to be assigned in accordance with geographical attendance zones, and, subject to an important temporary qualification to be mentioned, senior high students in Grades 10–12 will also be assigned on the basis of attendance zones.

 The zones themselves are depicted on maps introduced in evidence. The Court finds that the zones are rationally laid out by reference to natural boundaries or barriers, such as major streets and railroad tracks, to the locations of the schools, and to the residences of the students to be served. While the zone boundary lines are not straight, there is no evidence of any objectionable gerrymandering.

After the zone plan at the high school level becomes fully operational, all students residing east of the zone boundary line, which runs generally north and south, will be assigned to Northeast High School, regardless of race, and all students residing west of that line will be assigned to North Little Rock High School, the name of which is being changed to Southwest High School.

However, the zone plan will not be fully operational with the opening of school this fall. That is true because the Board plans to "phase out" the senior high grades at Jones. The 10th grade is to be eliminated this fall, and, as the Court understands it, the 11th and 12th grades are to be discontinued as of the beginning of the 1970–71 school year.

All students who will be in the 10th grade this fall, including Negro 10th graders, will be assigned in accordance with the zones, and the Board projects that 147 Negroes will be assigned to the Northeast Complex.

Students who are now in the 10th and 11th grades and who will be in the 11th and 12th grades in 1969–70 will be assigned on the basis of freedom of choice for that year. Thereafter all high school students will be assigned on the zone basis.

Since present 10th and 11th grade students have not yet expressed their choice preferences, the Board has no projections for the 1969–70 enrollments at either North Little Rock High School or Northeast High School, except that,

as indicated, the Board does predict that 147 Negro 10th graders will be assigned to Northeast.

There are five junior high attendance zones: Rose City, Jones, Jefferson Davis, Ridgeroad, and Lakewood. The old Fourth Street Junior High School is to be closed.

For Rose City the Board projects a total enrollment of 542 including 153 Negroes, for Jones 501 students of whom 159 will be white, for Jefferson Davis 641 pupils of whom 197 will be Negroes, for Ridgeroad 784 pupils including no Negroes, and for Lakewood ("Northeast Complex") 669 junior high school students all of whom will be white.[5]

With regard to faculty desegregation the plan amounts actually to nothing but a pledge that the District will refrain from racial discrimination in hiring, compensating, promoting, demoting, and discharging professional employees, and that reductions of force caused by desegregation will be handled in a racially non-discriminatory manner.

The Court has given careful consideration to the plan in the light of the District's constitutional requirement to disestablish its present dual school system and to replace it with a unitary system of integrated schools.

Had this plan come before the Court in 1959, the Court might have been able to approve it as a "transitional" plan. But, the Court is convinced that in 1969 the plan as written cannot be approved as either a permanent plan or as an interim plan.

Assuming for a moment that the plan should be approved in its entirety and

put into operation this fall, the following situation would exist:

1. An essentially segregated faculty with only token desegregation to the extent described heretofore.

2. An elementary school system operating under a freedom of choice method of pupil assignments which has not up to now served to disestablish the existing dual elementary school system, and with respect to which there is no reason to believe that it will prove effective to do so in the foreseeable future, if ever.

3. All students in the 10th and 11th grades at this time being free to choose their schools for one more year without there being any reason to believe that any white 10th or 11th grader will choose to go to Jones High School.

4. Substantial desegregation in three of the five junior high schools.

5. Two junior high schools attended by white students only.[6]

There are parts of the plan which the Court is prepared to approve, but the Court is not able to put its stamp of approval on the overall plan and believes that it would be completely unrealistic to think that if it did so its action would survive appeal.

■ As to faculty desegregation, the Court realizes that the District has problems due to opposition of the white population to integrated faculties and due to the unwillingness of many white teachers to teach in predominantly Negro schools. But, the duty of the Board to desegregate its faculties, like its duty to desegregate its student bodies, is a constitutional one, Rogers v. Paul, 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265; Cato v. Parham, Kelley v. Altheimer School District, and Kemp v. Beasley, all

5. Attention is called to the fact that during 1969–70 all of the children assigned to the Northeast Complex will be instructed in the same building and will share certain common facilities, such as the cafeteria. For later years, the Court understands that the Lakewood Junior High students will continue to share common facilities with the high school students. Thus, it is not entirely accurate to say

that Lakewood Junior High School will be an all white facility.

6. It may be observed that at the present time there are 22 Negroes in attendance at the Ridgeroad Junior High School. Fifteen of those students are in the 7th and 8th grades and under the plan will be assigned to other schools for 1969–70 on the basis of their residences.

supra, and cannot be made to yield to popular opposition, Copper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19, or to the reluctance of teachers to be assigned to schools where students of their race are in a minority.

There is no requirement in this Circuit, at least as of now, that public school faculties must be desegregated by means of any precise mathematical percentage to achieve racial balance among teachers, but there is no question that faculties must be essentially desegregated, and that right speedily. In point of fact, as counsel on both sides are well aware, certain school districts in Arkansas have been ordered in the past to achieve substantial desegregation of faculties by this school year and to complete the desegregation process by the next school year.

In such circumstances it is patently insufficient for the defendants here to content themselves with mere expressions of abstract good intentions without coming forward with some concrete proposals for increased faculty desegregation.

 The Court recognizes that it may well be impossible for the District to approach complete faculty desegregation, whatever that term ultimately may turn out to mean, by the opening of school in September. But, the Board must proceed forthwith to take steps to put more Negro teachers into the white schools and more white teachers in the Negro schools as of September, and to continue that process. It may be necessary for the Board to assign teachers to schools apart from their consent, or to replace or not rehire teachers who will not teach in integrated situations, or to emphasize willingness to teach in such situations as an employment criterion in connection with the hiring of new teachers. In addition the Board must be prepared to employ qualified Negroes at the higher administrative levels of the district.

 With regard to freedom of choice for elementary students, the deci-

sions of the Supreme Court in the Green case, the Raney case, and the Monroe, all supra, make it clear that a district like the North Little Rock District which is required to integrate its schools may assign its students to schools by the freedom of choice if, but only if, that method is capable in that particular district of producing integration, and that it is not a permissible method where it leaves the Negro schools all Negro although it may produce more or less desegregation of the white schools. And there is nothing in the opinions in those cases to suggest that a district may integrate only part of its system by a method other than freedom of choice and continue to use that method for another part of its system where the method is not effective to integrate that part.

There is no suggestion in this case that the parents of white elementary students in the District will be any more willing in the future than they have been in the past to have their children educated in the Negro elementary schools, or that their attitudes in the near future will be changed by the fact that students at the higher grade levels will be assigned on the basis of attendance zones.

The Court does not agree with the Board that alternatives to freedom of choice for the elementary students do not exist.

As far as pairing is concerned, the Court recognizes that some of the schools are rather far apart, and that distances between homes and schools may give some parents and students some transporation problems, particularly since the District does not provide transportation for any of its students. However, those problems would not seem to constitute any insuperable barrier to pairing of schools or grades.

The Board's objection to zoning for the elementary grades is that it will produce less integration than freedom of choice. The basis for that objection is not clear. What the Court thinks that the Board means is that if the elementary grades are zoned, white parents will

move out of Negro school zones or will take their children out of the District's schools, and further that some Negro children who would choose to be educated in white schools would be locked into the Negro schools in their neighborhoods.

Although the Board has studied zoning for the elementary grades, it has not brought into the record any depictions of possible elementary zones or any projections as to enrollments in particular elementary schools should they be zoned. Thus the Court has no idea how many children of either race would be assigned to any elementary school under any plan of zoning, and, of course, the Court does not know whether zoning of the elementary grades would produce an exodus of white students from the zones served by the Negro schools.

■ The possibility that Negro students desiring to go to the white schools may be locked into the Negro schools by attendance zoning may be guarded against to some extent by a provision in the plan permitting a student assigned to, a school in which members of his race comprise a majority of the student body freely to transfer to a school in which his race is in the minority. The propriety of such a provision is well established. See United States v. Greenwood Municipal Separate School District, 5 Cir., 406 F.2d 1086; Board of Public Instruction v. Braxton, 5 Cir., 402 F.2d 900; and Board of Education of Oklahoma City v. Dowell, 10 Cir., 375 F.2d 158; see also Kemp v. Beasley, supra. Indeed the HEW Guidelines now authorize such a provision in all voluntary desegregation plans based on zoning. 42 C.F.R., § 181.33(b).

But, however valid the Board's objections to pairing and zoning at the elementary grade levels may be from some standpoints, they cannot serve to justify the Board in continuing to use freedom of choice which has proved impotent as a means of integration.

■ The Court will go along with the Board in its desire to keep open Grades 11 and 12 at Jones High School during the 1969–70 school year, and in that connection to assign students now in the 10th and 11th grades at both the Jones High School and North Little Rock High School in accordance with their professed choices of schools. It is to be understood, however, that the 11th and 12th grades at Jones are to be closed at the end of the session above mentioned.

In determining to permit the high school grades at Jones to be phased out rather than discontinued immediately the Court gives some weight to the testimony that in the year beginning in September 1969 the Northeast High School, if operated, would not be accredited. The Court also gives some weight to the possible desire of Jones High School students who will graduate in the spring of 1970 to do so from their old school and with their old classmates. And the Court bears in mind that to permit the phasing out will probably give the veteran principal of Jones High School another year of employment as principal of that school. While the Court will not dwell on the matter, it will say that it thinks that the Board might do well during the interim to think about finding or making a suitable place in the system for that principal when his high school grades no longer exist.

■ It is necessary finally to consider the acceptability of the attendance zones for the senior and junior high schools. The Court finds them acceptable notwithstanding the fact that no Negro students reside in the Ridgeroad and Lakewood zones and notwithstanding the fact that Jones Junior High School will have a student body a very substantial majority of which will be Negroes.

First, the zones will eliminate all Negro junior and senior high schools. Although there will be a serious imbalance of race at Jones Junior High School, the percentage of Negroes who will attend Rose City and Jefferson Davis will be in substantial excess of the ratio of Negroes to whites in the District overall. The enrollment of Negroes at Rose City will be nearly 30 percent of the total en-

rollment at that school, and the enrollment of Negroes at Jefferson Davis will be slightly in excess of 30 percent. As indicated, Negroes make up only about 23 percent of the District's total enrollment at the junior high school level.

More basically, but with particular regard to the Ridgeroad, Lakewood, and Jones zones, neither the Supreme Court of the United States nor the Court of Appeals for this Circuit has held that the Constitution requires that all of the schools of districts having bi-racial student bodies must include students of both races, or that a school district must adopt a desegregation plan that will produce a maximum of integration, or that there must be racial balance in all of the schools of a district, or that a district must use irrational or arbitrary assignment procedures merely for the sake of promoting integration as an end in itself.

■■■ To put it another way, the Court does not believe that the Constitution requires that students be transported for unreasonable distances or be subjected to inconveniences, hardships, or hazards merely for the sake of integration and without regard to resulting adverse effects on the children and on a school district's educational program itself.[7]

It must be remembered that even in pre-Brown days when Arkansas school districts were required to have segregated schools, the schools themselves, whether for white students or Negro students, were not *located* for the purpose of establishing segregation. They were located to serve children; this meant, of course, that where the residential pattern of a given district was segregated, schools for Negro children would be built in Negro neighborhoods and schools for white children would be built in white neighborhoods. But, the law of Arkansas has never required segregated residential patterns; they came about for other reasons, largely economic or personal.

■■■ The Court is of the opinion that where, as here, a school district maintains a number of schools built substantially in accordance with the neighborhood school concept, and where logical attendance zones are established in good faith and not for the purpose of preserving segregation or minimizing integration, and where the zones are geared to geographical boundaries or divisions, to the locations of the schools, and to the residences of the students, such zones are not unconstitutional simply because whites and Negroes within the district dwell in segregated neighborhoods and because the racial makeups of the neighborhoods are reflected in the schools of particular zones.

A decree will be entered enjoining the defendants from maintaining further an unconstitutional dual school system, approving the District's proposed attendance zones for senior and junior high school students, permitting the phasing out of the senior high school grades at Jones, disapproving the plan as far as the elementary schools and faculty are concerned, and directing the District to file an amended plan not later than May 15 of the current year dealing with elementary school and faculty desegregation. Questions of costs and an attorney's fee for counsel for plaintiffs will be deferred until the amended plan is submitted and considered.

7. The Court notes in passing that section 407(a) of the Civil Rights Act of 1964 which gives to the federal courts jurisdiction of suits brought by the Attorney General to end discrimination in public schools provides specifically that it does not authorize those courts to issue any order seeking to achieve a racial balance in any school by "requiring the transportation of pupils or students from one school to another or one school district to another in order to achieve such racial balance, or otherwise enlarge the existing power of the court to insure compliance with constitutional standards." 42 U.S. C.A. § 2000c–6(a).