Moses KELLEY, on Behalf of Himself and His Minor Children, Moses Kelley, Jr., et al., Appellants,

v.

The ALTHEIMER, ARKANSAS PUBLIC SCHOOL DISTRICT NO. 22, a Public Body Corporate, and The J. E. Stowers Construction Company, Appellees.

No. 18528.

United States Court of Appeals
Eighth Circuit.

April 12, 1967.

Rehearing Denied April 20, 1967.

Rehearing En Banc Denied
May 9, 1967.

Michael Meltsner, New York City, for appellants; Jack Greenberg and James M. Nabrit, III, New York City, John W. Walker, Little Rock, Ark., and Delector Tiller, Little Rock, Ark., on the brief.

Robert V. Light, Little Rock, Ark., for appellees; Herschel H. Friday, Little Rock, Ark., and E. Harley Cox, Jr., Pine Bluff, Ark., on the brief.

Before MATTHES, LAY and HEANEY, Circuit Judges.

HEANEY, Circuit Judge.

On February 15, 1966, the appellants, Negro citizens and residents of Altheimer Public School District No. 22, Jefferson County, Arkansas, initiated a class action suit in equity pursuant to Title 42, U.S.C. § 1983. In their Complaint, they asked for a preliminary and permanent injunction enjoining the Altheimer Public School District and the J. E. Stowers Construction Company from continuing plans to construct, and from constructing, separate elementary schools for white and Negro students.[1] They also asked for a temporary and permanent injunction enjoining the School District from continuing the policy, practice, custom and usage of assigning pupils, faculty and administrative staff on a racially discriminatory basis and from continuing any policy or practice of racial discrimination in the operation of the Altheimer School District. The case was argued before the Honorable J. Smith Henley, Judge of the United States District Court for the Eastern District of Arkansas, Pine Bluff Division, on March 31, 1966. Judge Henley dismissed the Complaint in a momorandum decision handed down June 3, 1966. The decision was subsequently appealed to this Court.

The Altheimer School District includes the town of Altheimer together with a

1. Subsequent to dismissal of the suit by the District Court, the construction sought to be enjoined was completed.

substantial rural area of Jefferson County in the vicinity of the town. It has a 67% non-white population with a high concentration of poverty-stricken families—a majority of whom are Negro.[2] The District could not be operated in its present manner without substantial federal funds. In 1965–66, the District had a total enrollment of 1,408 students, of whom 741 were elementary students and 667 were junior and senior high students.

Prior to the 1965–66 school year, the District maintained totally racially segregated schools. Negro students were taught in a complex known as the Martin School, and white students in a complex known as the Altheimer School.[3] The two building complexes are within six blocks of each other. Both sites serve students from grades one through twelve. About two-thirds of the students are transported to school by bus from outlying areas. Each school operates its own bus system with the result that the bus routes are frequently duplicated. The administrative staff of the District is entirely white except for the Negro principal of Martin High School. The faculty, before 1965–66, was completely segregated, with white students taught only by white teachers and Negro students only by Negro teachers.[4]

In response to the enactment of Title VI of the Civil Rights Act of 1964 and the promulgation of guidelines by the Department of Health, Education and Welfare (H.E.W.) implementing Title VI, the Altheimer School District submitted a voluntary plan of desegregation [5] in April, 1965, which, after amendment, was finally approved by the Commissioner of Education and went into operation in September, 1965. The plan adopted was the so-called "freedom of choice" [6]

2. The Board estimates that about 797 of its 1,408 students come from homes with incomes of less than $2,000 annually. About 72% of the children attending Martin and 51% of those at Altheimer are classified as impoverished. The poor work produced by some of the District's children is attributed by the Board to an inadequate diet.

3. Midway between the two sites is another building in which vocational agriculture is taught. One hundred and seven Negro students from Martin, three Negro students from Altheimer, and forty-three white students from Altheimer attend classes in this building. They are taught one hour a day by a full-time white and a full-time Negro teacher. The appellants did not challenge its operation.

4. Approximately 930 of Arkansas' 111,952 Negro pupils were enrolled in schools with white pupils during the 1964–65 school year. By 1965–66, this figure had risen to 4,900 Negro enrollees or 4.38%, and by the current school year to 19,500 or nearly 16%. By the current school year, there were 119 white teachers in predominantly Negro schools and 203 Negro teaches in predominantly white schools. See "STATISTICAL SUMMARY," SOUTHERN EDUCATION REPORTING SERVICE, December, 1965, 15th Revision, p. 5; "BALTIMORE NEWS AMERICAN," Baltimore, Maryland, December 28, 1966.

5. The Court has, on a number of occasions, used the terms "desegregation" and "integration" interchangeably in its opinions. See, e.g., Rogers v. Paul, 345 F.2d 117, 120–21 (8th Cir. 1965), reversed 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265 (1965); Norwood v. Tucker, 287 F.2d 798, 801 (8th Cir. 1961); Parham v. Dove, 271 F.2d 132, 136–37 (8th Cir. 1959); Aaron v. Cooper, 257 F.2d 33, 37 (8th Cir. 1958). To avoid any dispute over semantics, the terms "desegregate" or "desegregation" will be used throughout this opinion to refer to the constitutional obligation of the appellee School District to establish a unitary, non-racial system.

6. Approximately 57% of all voluntary desegregation plans approved by the Office of Education in 1965 were based on "freedom of choice." See "SURVEY OF SCHOOL DESEGREGATION IN THE SOUTHERN AND BORDER STATES 1965–66," United States Commission on Civil Rights (February 1966), at 29. During hearings before the Special Subcommittee on Civil Rights of the House Judiciary Committee, in Washington, D. C., December 14, 15 and 16, 1966, Assistant Commissioner of Education David Seeley, head of the Equal Educational Opportunities Program, said he felt a sense of guilt that he and his staff had allowed the term "freedom of choice" to be perpetuated since there was in no

plan under which students may express choices for assignments to a particular school, the assignments to be honored as a matter of course unless they result in overcrowding. In the event of overcrowding or a failure to exercise a choice, a student is supposed to be assigned to the school nearest his home where space is available. All grades are afforded a choice each year. The plan also requires the Board of Education to take affirmative steps to implement a desegregation plan.[7]

During the first year's operation of the "freedom of choice" plan (1965–66), two Negro elementary students and four Negro high school students requested assignment to Altheimer. No white students requested assignment to Martin. All the Negro requests were granted.

In 1966–67, twenty-three Negro students requested and were granted admittance to Altheimer Elementary School and twenty-four Negro pupils requested and were granted admittance to the Altheimer High School. No white students requested a transfer to Martin, which remained 100% Negro.

Apart from a few white teachers who teach in the all-Negro school, the faculty of the District remains segregated.

The trial court supported its dismissal of the appellants' Complaint on the following grounds:

(1) The Board of Education, by adopting a "freedom of choice" plan under which the doors of the formerly all-white school were opened to Negroes, satisfied the requirements of the Fourteenth Amendment. If Briggs v. Elliott, 132 F.Supp. 776 (E.D.S.C.1955) is still good law, the Commissioner of Education is going further than the Constitution requires by seeking to fully integrate public school student bodies and faculties and to eliminate dual school facilities.

(2) The H.E.W. Guidelines adopted by the School District (the Court stated it assumed they would be enforced and obeyed) are a prompt and reasonable start towards the elimination of unconstitutional racial discrimination within a reasonable time and is within the tolerance, if not beyond, the requirements of Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955)

sense really a "free choice" in an atmosphere of oppression. He further pointed out that the choice invariably was between a "Negro school" and a "white school" rather than two typical community schools. Commissioner of Education Harold Howe, II, observed at these same hearings that such plans unfairly place the "burden of desegregation" on Negro children and their parents, and are also "not a good way to organize" school systems since they involve many elements of inconvenience and inefficiency. See also, Singleton v. Jackson Municipal Separate School Dist., 355 F.2d 865, 871 (5th Cir. 1966), where the Court said: "In the long run, it is hardly possible that schools will be administered on * * * such [a] haphazard basis (as freedom of choice) * * *."

7. Section 602 of Title VI requires the Department of Health, Education and Welfare to issue regulations to assure the elimination of discrimination in federal aid programs. These are published at 45 C.F.R., Part 80 (1966). The guidelines recognize two methods of eliminating seg-

regation in the schools. These are: (1) by a desegregation order of a Federal Court, or (2) by a voluntary desegregation such as that adopted here. Under the plan here, the School District must provide assurance that it will comply with applicable requirements and implement a desegregation plan to eliminate the dual school system and all other forms of discrimination as expeditiously as possible. Specifically, the Board agrees to: (1) remove any segregation or other form of discrimination affecting students in connection with all services, facilities, activities and programs that may be conducted or sponsored by or affiliated with the schools of the system; (2) route and schedule transportation on the basis of such factors as economy and efficiency, and not so as to impede desegregation; (3) conduct special education programs without segregation; (4) take steps to encourage community support and prepare students, teachers and other personnel for the successful desegregation of the school system; and (5) within their authority, provide protection of persons exercising rights under the plan.

and Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

(3) The responsibility for the enforcement of the guidelines rests with the Department of Health, Education and Welfare. Since the guidelines may go beyond what the Constitution requires by requiring that there be full integration of public school student bodies and faculties and the elimination of dual facilities, the Court will leave their enforcement to H.E.W.

## VALIDITY OF FREEDOM OF CHOICE PLAN

The appellants do not challenge the constitutionality of "freedom of choice" plans per se;[8] rather, they urge that the plan is inadequate to accomplish desegregation in this School District and, thus, that the lower court erred in dismissing the Complaint.

At the outset, we emphasize that this Court has rejected the *Briggs* approach. Judge Gibson, writing in Kemp v. Beasley, 352 F.2d 14, 21 (8th Cir. 1965), stated:

"In support of their 'freedom of choice' plan the Board places great reliance in the dicta found in Briggs v. Elliott, 132 F.Supp. 776, 777 (E.D. S.C.1955) to the effect 'the Constitution, in other words, does not require integration. It merely forbids discrimination.' Therefore, they argue that as long as the Negro is not required to attend the Negro school his constitutional rights have not been violated.

"We cannot accept the position advanced by the Board on this matter. *The dictum in Briggs has not been followed or adopted by this Circuit and it is logically inconsistent with Brown and subsequent decisional law on the subject.* This well known dictum may be applicable in some logical areas where geographic zones permit of themselves without discrimination a segregated school system, but must be equally inapplicable if applied to school systems where the geographic or attendance zones are bi-racially populated. * * *" (Emphasis added.) See Dove v. Parham, 282 F.2d 256, 258 (8th Cir. 1960).

The *Briggs* dictum has also been rejected by the Fifth Circuit, United States et al. v. Jefferson County Bd. of Education et al., Civil No. 23345, 1966, 372 F.2d 836, rehearing held March, 1967, 380 F. 2d 385; Singleton v. Jackson Municipal Separate School District, 348 F.2d 729, 730, n. 5 (5th Cir. 1965); the Tenth Circuit in Board of Education of Oklahoma City Public Schools et al. v. Dowell et al., Civil No. 8523, 10th Cir., 1967 375 F.2d 158 and the Third Circuit in Evans v. Ennis, 281 F.2d 385 (3rd Cir. 1960), cert denied 364 U.S. 802, 81 S.Ct. 27, 5 L.Ed.2d 36 (1961).

Secondly, we have made it clear that a Board of Education does not satisfy its constitutional obligation to desegregate by simply opening the doors of a formerly all-white school to Negroes.[9]

---

8. Tentative acceptance of the "freedom of choice" method for desegregation of public schools has been voiced by this Court. In Clark v. Board of Education of Little Rock School Dist., 369 F.2d 661, 665 (8th Cir. 1966), we said:

 "We do not believe that a general attack on the constitutionality of the 'freedom of choice' method of ending school segregation is well taken at this time."

 See also, Kemp v. Beasley, 352 F.2d 14 (8th Cir. 1965) ; Smith v. Board of Education of Morrilton Sch. Dist. No. 32, 365 F.2d 770 (8th Cir. 1966).

9. In Wall v. Stanly County Board of Education, 259 F.Supp. 238, 253 (S.D.N.Y. 1966), the Court approvingly quoted the following from Kier et al. v. County School Board of Augusta County, Va., et al., 249 F.Supp. 239, 246 (W.D.Va.1966):

 " * * * 'The ideal to which a freedom of choice plan must ultimately aspire, as well as any other desegregation plan, is that school boards will operate "schools," not "Negro schools" or "white schools." ' * * * Freedom of choice, in other words, does not mean a choice between a clearly delineated 'Negro school' (having an all-Negro fac-

Thus, in cases where we have approved the "freedom of choice" plan, we have required (1) that students have the right to an annual choice and that if they fail to make a choice, they be assigned to a school on a non-racial basis, (2) that Boards of Education refrain from interfering with the student's "freedom of choice," and (3) that faculties and operating staffs be desegregated. See e. g., Kemp v. Beasley, supra; Clark v. Board of Education of Little Rock School Dist., 369 F.2d 661 (8th Cir. 1966).

■ Thirdly, this Court has stated that it will rely heavily on H.E.W. Guidelines. In this case, however, the record indicates that compliance has been less than complete.[10]

■ Finally, this Court has made it clear that under their continuing responsibility to protect the constitutional rights of parties who appeal to it for protection, District Courts should retain jurisdiction in school segregation cases to insure (1) that a constitutionally acceptable plan is adopted, and (2) that it is operated in a constitutionally permissible fashion so that the goal of a desegregated, non-racially operated school system is rapidly and finally achieved. Clark v. Board of Education of Little Rock School Dist., supra 369 F.2d at 671.

ulty and staff) and a 'white school' (with all-white faculty and staff). School authorities who have heretofore operated dual school systems for Negroes and whites must assume the duty of eliminating the effects of dualism before a freedom of choice plan can be super-imposed upon the pre-existing situation and approved as a final plan of desegregation. *It is not enough to open the previously all-white schools to Negro students who desire to go there while all-Negro schools continue to be maintained as such.* Inevitably, Negro children will be encouraged to remain in 'their school,' built for Negroes and maintained for Negroes with all-Negro teachers and administrative personnel. See Bradley v. School Bd. supra, 4 Cir., 345 F.2d at 324 (dissenting opinion). This encouragement may be subtle but it is nonetheless discriminatory. * * *" (Emphasis added.)

10. Judge Gibson in Kemp v. Beasley, supra, 352 F.2d at 19, wrote:
"Therefore, to the end of promoting a degree of uniformity and discouraging reluctant school boards from reaping a benefit from their reluctance the courts should endeavor to model their standards after those promulgated by the executive. They are not bound, however, and when circumstances dictate, the courts may require something more, less or different from the H.E.W. guidelines."
A letter of February 13, 1967, from the Deputy Special Assistant to the Secretary for Civil Rights, Department of Health, Education and Welfare, to the appellants, indicates that the District was not in compliance with the guidelines:
"1. The Altheimer school district has filed a Form 441–B which constitutes a commitment to conform with the school desegregation guidelines issued by the Office of Education. Title VI requires adequate performance as well as the promises contained in the written assurances filed with this office.
"2. Based on the statistics set forth below, the Office of Education has not been able to make a finding that this district is presently in compliance with Title VI:

| | 1965–66 | 1966–67 |
|---|---|---|
| White | 376 | 406 |
| Negro | 909 | 1009 |
| Desegregation | 6 (.66%) | 47 (4.6%) |

| Teachers 1966–67 | 2 schools in district |
|---|---|
| White-21 | 2 teachers part-time |
| Negro-41 | 1 full-time across racial lines |

"3. The Altheimer district is one of a group of approximately 50 school districts whose desegregation performance is sufficiently poor so that they have been scheduled for early review. * * *"

■ The appellee School District will not be fully desegregated nor the appellants assured of their rights under the Constitution so long as the Martin School clearly remains identifiable as a Negro school.[11] The requirements of the Fourteenth Amendment are not satisfied by having one segregated and one desegregated school in a District. We are aware that it will be difficult to desegregate the Martin School. However, while the difficulties are perhaps largely traditional in nature, the Board of Education has taken no steps since *Brown* to attempt to change its identity from a racial to a non-racial school. It has made no effort to employ or assign white faculty members to Martin, and it has maintained a transportation policy which encourages the identification of Martin as a Negro school. It has even failed to provide the school with sufficient funds, resulting in heavier class loads for its teachers, inferior library facilities and a lower scholastic rating.[12] The construction program, which served as the basis of the appellants' Complaint, emphasized the intention of the Board of Education to maintain a racially segregated school system. Under such circumstances, it is understandable that no white students can be expected to transfer to it.

In the light of this background, the appellants urge that the "freedom of choice" plan cannot effectively desegregate the schools in this District. They ask that we require the Board of Education to take action immediately to integrate all of the elementary classes at one site and the secondary classes at the other. Though this solution has great appeal because of its simplicity, and obvious efficiency, we are not prepared to hold at this time, in view of our recent decisions in Smith v. Board of Education of Morrilton Sch. Dist. No. 32, 365 F.2d 770 (8th Cir. 1966); Clark v. Board of Education of Little Rock, supra; and Kemp v. Beasley, supra, that desegregation in accordance with the Constitution cannot be accomplished if students are permitted to attend the schools of their choice. See also, Lee et al. v. Macon County Board of Education et al., Civil No. 604–E, 267 F.Supp. 458 (D.C. E.D.Ala.1967). In so holding, we make

11. "The central truth which emerges from this report and from all of the Commission's investigations is simply this: Negro children suffer serious harm when their education takes place in public schools which are racially segregated, whatever the source of such segregation may be.

"Negro children who attend predominantly Negro schools do not achieve as well as other children, Negro and white. * * *

" * * * Negro children believe that their schools are stigmatized and regarded as inferior by the community as a whole. Their belief is shared by their parents and by their teachers. And their belief is founded in fact.

" * * * Negroes in this country were first enslaved, later segregated by law, and now are segregated and discriminated against by a combination of governmental and private action. They do not reside today in ghettos as the result of an exercise of free choice and the attendance of their children in racially isolated schools is not an accident of fate wholly unconnected with deliberate segregation and other forms of discrimination. In the light of this history, the feelings of stigma generated in Negro children by attendance at racially isolated schools are realistic and cannot easily be overcome." 1 RACIAL ISOLATION IN THE PUBLIC SCHOOLS, A REPORT OF THE UNITED STATES COMMISSION ON CIVIL RIGHTS (1967), p. 193.

12. Inequalities between the schools exist in a number of areas, the more important of which are:

*PER PUPIL COST*

Per pupil cost at Altheimer High School was approximately $390, as compared to $192 at Martin, for the year ending June, 1965. At Altheimer Elementary School, the cost was about $265 per pupil as compared to $165 per pupil at Martin.

*ACCREDITATION*

Altheimer has received accreditation by the North Central Association (N.C.A.), which is the highest rating of schools in its section of the nation. Martin is not so accredited, primarily because of its inadequate library.

*STUDENT-TEACHER RATIO*

| | |
|---|---|
| Martin Elementary School | 1–23 |
| Martin High School | 1–22 |
| Altheimer Elementary School | 1–26 |
| Altheimer High School | 1–17 |

it clear, however, that we do not give our approval to the manner in which the Altheimer School District has met its responsibilities to desegregate the school system in the past, and we emphasize that if the plan is to be successful in the future, the Board of Education must remove every impediment to the exercise of a meaningful choice by students, and it must take action to eliminate those policies and practices which discourage the desegregation of the school system.

We turn then to consider the steps which must be taken by the appellee School District to fulfill its constitutional responsibilities, and to eliminate present obstacles to a "free choice" by parents and students.

## FACULTY

The faculty of the District is still largely segregated on the basis of race.[13] Not a single Negro serves as a classroom teacher in either the elementary or secondary white school. Only one full-time and three part-time white teachers are currently teaching in the Negro school. Two additional white teachers perform some administrative and counselling duties in the Negro school. A visitation program between teachers of the schools was initiated in 1965.

Negro teachers are paid less than white teachers of comparable education, training, teaching experience and tasks,[14] and they teach larger classes.

The Board of Education took no steps to desegregate the faculty in the decade

from *Brown* to the passage of the 1964 Civil Rights Act, and has taken only token steps since 1964.

Only three Negro teachers and six white teachers, currently employed by the Board, were on the faculty at the time of *Brown.* Thus, the Board has had numerous opportunities to desegregate the faculty when hiring and assigning new teachers. Instead of doing so, it continued to hire and assign on the basis of race.

While the Board of Education committed itself before the District Court and this Court to equalize salaries, no similar commitment has been made with respect to the class size or faculty desegregation;[15] indeed, the superintendent of schools stated that he did not intend to reassign any of the teachers to a school other than the ones in which they were teaching at present.

The Court, in Brown v. County School Board of Frederick County, Va., 245 F.Supp. 549, 560 (W.D.Va.1965), stated:

"* * * the presence of all Negro teachers in a school attended solely by Negro pupils in the past denotes that school a 'colored school' just as certainly as if the words were printed across its entrance in six-inch letters.

* * *"

It may be added, that the converse is also true, that an all-white faculty in a school attended exclusively by whites in the past denotes that school as a "white school."

13. The record does not indicate whether other school personnel, such as maintenance men and bus drivers are assigned to schools on a basis which contributes towards the continued segregation of the schools.

14. The superintendent testified he paid them less because he could hire them for less. The lowest paid white teachers in the District received a $4,300 salary. Only two teachers were in this category; the remainder received in excess of $4,500. The twelve lowest-paid Negro teachers received $4,000; thirteen received $4,300; and five, including the principal, received $4,500 or more.

15. The superintendent of schools testified that teachers were originally hired and assigned on a racial basis, and that he would not reassign them within the school system as long as they were doing a good job. The trial court, in commenting on this testimony, said:

"Gentlemen, let's not quibble about it. It suffices to say that if they are rehired in the same positions this action will tend to a degree at least to perpetuate some reassignment in fact on racial segregated basis. There doesn't seem to be in question about that, regardless of the motive, what the motive in the rehiring may have been."

The failure of the Board to take any steps towards desegregation of the faculty for more than a decade after *Brown I and II,* and the statement of the superintendent of schools that he does not intend to reassign faculty members within the school system make it highly probable that faculties will not be desegregated unless such action is compelled by this Court or by the Department of Health, Education and Welfare.[16] Regardless of the steps which may be taken by H.E.W. to secure compliance, we will not avoid our responsibility in the matter.

■ The Supreme Court and four Circuit Courts, including our own, have made it clear that a school District may not continue a segregated teaching staff.

In Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, supra, the Court indicated problems relating to relocating staff to be one reason for permitting the desegregation process to proceed with all deliberate speed.

In Bradley v. School Board of City of Richmond, 345 F.2d 310 (4th Cir. 1965), the Fourth Circuit refused to consider the issue of faculty assignment by race. The Supreme Court, in a per curiam reversal of that case, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965) held that faculty segregation had a direct impact on a desegregation plan, and that it was improper for the trial court to approve a desegregation plan without inquiring into the matter of faculty segregation. In reaching this conclusion, the Court in a unanimous opinion, commented that "there is no merit to the suggestion that the relation between faculty allocation on an alleged racial basis and the adequacy of the desegregation plans is entirely speculative." It emphasized the urgency of its ruling by stating that "delays in desegregation of school systems are no longer tolerable." 382 U.S., supra, at 105, 86 S.Ct. at 226.[17]

In Rogers v. Paul, 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265 (1965), the Supreme Court extended the undelayed right to challenge teacher segregation to students who had not yet themselves been affected by the school board's gradual desegregation plan. In protecting the right of students to be taught in schools staffed on a non-racial basis, the Court, at page 200, 86 S.Ct. at 360, said:

"* * * Two theories would give students not yet in desegregated grades sufficient interest to challenge racial allocation of faculty: (1) that racial allocation of faculty denies them equality of educational opportunity without regard to segregation of pupils; and (2) that it renders inadequate an otherwise constitutional pupil

---

16. The racial identity of Southern schools is maintained in a variety of ways. One is the continued segregation of teaching staff. 1 RACIAL ISOLATION IN THE PUBLIC SCHOOLS, supra at 67.

17. Each time the Supreme Court has considered school desegregation since *Brown,* it has indicated a growing impatience with the speed of the process. In Cooper v. Aaron, 358 U.S. 1, 7, 78 S.Ct. 1401, 1404, 3 L.Ed.2d 5 (1958), the Court said:
"* * * [O]nly a prompt start, diligently and earnestly pursued, * * * could constitute good faith compliance. * * *"
Four years later, in a case involving the public parks of Memphis, the Court observed:
"* * * Given the extended time which has elapsed, it is far from clear that the mandate of the second *Brown* decision requiring that desegregation proceed with 'all deliberate speed' would today be fully satisfied by types of plans or programs for desegregation of public educational facilities which eight years ago might have been deemed sufficient. * * *" Watson v. City of Memphis, 373 U.S. 526, 530, 83 S.Ct. 1314, 1317, 10 L.Ed.2d 529 (1963).
One year later, in the *Prince Edward County* case, the Court noted that:
"* * * There has been entirely too much deliberation and not enough speed in enforcing the constitutional rights which we held in Brown v. Board of Education, supra, had been denied Prince Edward County Negro children. * * *" Griffin v. County School Bd. of Prince Edward, 377 U.S. 218, 229, 84 S.Ct. 1226, 1232, 12 L.Ed.2d 256 (1964).
"* * * The time for mere 'deliberate speed' has run out, * * *." Id. at 234, 84 S.Ct. at 1235.

desegregation plan soon to be applied to their grades. \* \* \*"

The Fourth, Fifth and Tenth Circuits have also held that race must be eliminated as a basis for the employment and assignment of teachers, administrators and other personnel. Board of Education of Oklahoma City Public Schools et al. v. Dowell et al., supra; United States et al. v. Jefferson County Board of Education et al., supra; Wheeler v. Durham City Board of Education, 363 F.2d 738, 741 (4th Cir. 1966); Chambers v. Hendersonville City Board of Education, 364 F.2d 189 (4th Cir. 1966); Singleton v. Jackson Municipal Separate School District, supra; Board of Public Instruction of Duval County, Fla., et al. v. Braxton et al., 326 F.2d 616 (5th Cir. 1964), cert. denied 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216 (1964). See also, Northcross v. Board of Education of the City of Memphis, Tenn., 333 F.2d 661 (6th Cir. 1964); Jackson v. School Board, City of Lynchburg, Va., 321 F.2d 230 (4th Cir. 1963); Mapp v. Board of Education, City of Chattanooga, Tenn., 319 F.2d 571, 576 (6th Cir. 1963); Augustus et al. v. Board of Public Instructions of Escambia County, Fla., et al., 306 F.2d 862 (5th Cir. 1962); Christmas v. Board of Education of Hartford County, Md., 231 F.Supp. 331 (D.C., D.Md., 1964); 53 Va.L.Rev. 1 (1967).

■ Our own Court's decisions on the obligation to desegregate faculties are unequivocal.

In Kemp v. Beasley, supra, 352 F.2d at 22, Judge Gibson said:

"Plaintiffs also complain that the Court did not order faculty and staff desegregation. The Court recognizes the validity of the plaintiffs' complaint regarding the Board's failure to integrate the teaching staff. Such discrimination is proscribed by Brown and also the Civil Rights Act of 1964 and the regulations promulgated thereunder. \* \* \*"

In Smith v. Board of Education of Morrilton Sch. Dist. No. 32, supra, 365 F.2d at 778, Judge Blackmun said:

"It is our firm conclusion that the reach of the *Brown* decisions, although they specifically concerned only pupil discrimination, clearly extends to the proscription of the employment and assignment of public school teachers on a racial basis. (Citing cases.) This is particularly evident from the Supreme Court's positive indications that non-discriminatory allocation of faculty is indispensable to the validity of a desegregation plan. \* \* \*"

And, in Clark v. Board of Education of Little Rock School Dist., supra, 369 F.2d at 669–670, Judge Gibson stated:

"We agree that faculty segregation encourages pupil segregation and is detrimental to achieving a constitutionally required non-racially operated school system. It is clear that the Board may not continue to operate a segregated teaching staff. \* \* \* *It is also clear that the time for delay is past. The desegregation of the teaching staff should have begun many years ago.* At this point the Board is going to have to take accelerated and positive action to end discriminatory practices in staff assignment and recruitment. (Emphasis added.)

\* \* \* \* \* \* \*

" \* \* \* We are not content at this late date to approve a desegregation plan that contains only a statement of general good intention. We deem a positive commitment to a reasonable program aimed at ending segregation of the teaching staff to be necessary for the final approval of a constitutionally adequate desegregation plan. \* \* \*"

■ From these decisions, it is clear that affirmative action must be taken by the Board of Education to eliminate segregation of the faculty. While this may well be the most difficult problem in the desegregation process,[18] it has been made

18. The Department of Health, Education and Welfare, in a May 31, 1966, Bulletin, outlines steps a Board may take to ease the difficulties. It urges: (1) efforts to

more difficult by the failure of the Board to desegregate the faculties by filling vacancies on a non-racial basis.

We cannot permit the difficulties involved in desegregating the faculties to deter us from achieving what the Constitution requires. To facilitate faculty desegregation, we urge that the full understanding and cooperation of the Negro and white faculty be sought. Experience has indicated that where an effort is made to obtain such cooperation, it is given, that the task is made easier and that the results are more productive.

## FACILITIES

### The New Construction:

The School Board began discussions regarding construction of new elementary classrooms in 1957. The planning for these classrooms proceeded on the basis that since the Martin and Altheimer Elementary Schools *would continue to be segregated,* a larger number of classrooms were needed for the Martin complex.

Final action on construction was not taken until after April, 1965, at which time the Board decided to construct two new buildings, each containing eight elementary classrooms and related facilities at the Martin site, and a single building containing six elementary classrooms and related facilities at the Altheimer site.

A school bond election was scheduled for September 28, 1965. Prior to the election, one P.T.A. meeting was held at each school for discussion of the building program. The "Pine Bluff Commercial," a newspaper of local distribution, carried stories of the construction plans in the July 22, September 26, and September 28, 1965, issues.

Prior to the bond election, a mimeographed notice urging parents to vote on the issue was sent home with the school child. Proper legal notices of the election also appeared in the local newspapers.

Only 230 voters cast ballots in the election in which the bond issue was approved. Following approval, the Board contracted with the J. E. Stowers Construction Company for building the facilities. Five days after letting of the contract, the appellants filed the present suit to enjoin construction, contending that the building plan would tend to perpetuate racial segregation.

The school superintendent testified that the Board (1) did not consider alternative building plans, (2) did not consider whether the construction would aid or hinder desegregation, and (3) was mainly concerned with the need to build the facilities. He stated that by adopting the "freedom of choice" plan, the Board had done all that was necessary to comply with the law. He said that the Board would meet any problem of overcrowding when it arose but that at present, there was space for approximately sixty or seventy additional students at the Altheimer complex. He indicated that if the number of applicants for either school exceeded available space, those pupils living nearest the overcrowded school would be assigned to it.[19]

The appellants' expert witness [20] stated that if the school construction was per-

---

obtain full community support, (2) enlistment of assistance of white and Negro professional staff in planning and carrying out the desegregation plan, (3) selection of best teachers for minority assignment, (4) transfer of several minority teachers at one time so they can have mutual support in their new environment, (5) strong leadership by school administrators, and (6) use of all available assistance.

19. Upon oral argument, the appellee School District's attorney stated that if there were more applicants than spaces for any

grade in either school, students would be assigned, without exception, to the school nearest their home. He further stated that it was extremely unlikely that any two students would live identical distances from the two schools. His observation that the white and colored population was widely scattered throughout the School District was not challenged.

20. The expert witness was Dr. Myron Lieberman, Director of Education Research and Development at Rhode Island College, Providence, Rhode Island. His background includes a Bachelor's degree in

mitted as planned, segregation in the District would be prolonged. He declared that there was no educational, financial, or other legitimate basis for the maintenance of two separate school complexes within such a small District or for additional construction of elementary buildings *to serve two separate student bodies*. He maintained that the most practical way of eliminating segregation within the District would be to concentrate the elementary students at the Martin site and the secondary students at the Altheimer site.

The trial judge rejected these arguments. In dismissing the Complaint, he stated:

"If the defendant District can use freedom of choice, subject to the restrictions and requirements of the new guidelines, to bring about desegregation, as the Court holds that it can, there is no constitutional objection to the District's constructing buildings on both of its sites or on the Altheimer site. As desegregation proceeds under the guidelines, it is clear that both sites will be used for the benefit of students of both races. It must be remembered that when two school sites rather than one were established, the maintenance of dual school systems was generally if not universally considered to be constitutional, and there is nothing in the constitution which says that the District must now abandon one of its sites.

"As stated, the two sites are close together, and they can be used conveniently as components of the unitary school system which is now foreseeable.

\* \* \* \* \* \*

"The Court is not concerned here with whether it is wise or economical for the District to maintain the two sites or to construct elementary classroom buildings on both sites. The Court is not convinced that in planning

the new construction and in adhering to its plan following the passage of the Act the Board was motivated by a desire to perpetuate segregation, or that the effect of the construction will have that effect."

■ We cannot agree with the reasons advanced by the trial court in support of its decision. (1) The court's conclusion that both sites (unless clearly required) will be used for the benefit of both races is totally unsupported by the evidence and is contradicted by the court in its opinion.[21] (2) The District is not being asked to abandon one of its sites, but rather to use one site for an elementary school and the other for a secondary school. (3) The testimony of the appellants that there was no economic or education justification for the Board's action stands virtually uncontradicted. (4) The small vote on the bond election, the fact no survey of the Negro community was made, and the evidence that the Board never considered alternative plans which might have encouraged desegregation indicate to us a complete lack of community involvement in the decision to construct the new buildings, and a desire to retain the status quo.

Nor do the facts sustain the trial court's finding that the new buildings were not designed to perpetuate segregation.

The new buildings were the product of a ten-year building program begun when the District operated on a segregated basis. The Board made no changes in the plans in response to the mandate of the Supreme Court in *Brown* or any subsequent decisions by either the Supreme Court or this Court. Nor did the Civil Rights Act of 1964 cause the Board to alter its plans even though it finally agreed to desegregate the school system by indicating acceptance of the guidelines.

Law and Social Science from the University of Minnesota, and a Master's and Ph.D. degrees from the University of Illinois. At Illinois, his major field of study was Education.

21. The trial court stated:
"The Court has little trouble with plaintiff's first premise that if given a choice white students will remain in all white schools or in predominantly white schools."

The traditional attendance patterns were assured by the addition of about twice the number of classrooms at the Negro site than at the white site, the ratio of classrooms to white and non-white students being $9/198$ and $19/534$, respectively.

The trial court determined that if given a choice, white students would remain in an all-white school or a predominantly all-white school. The superintendent's testimony indicates the Board was also aware of this axiom.[22] Nevertheless, classroom space at the traditionally all-white Altheimer complex was limited to six classrooms. This action sharply brought home to the Negro community the Board's expectation that their present and future children were to continue attending the traditionally all-Negro Martin School, and that there would not be room for them at Altheimer.

Indeed, the Board limited the size of Altheimer Elementary School to the point where it is impossible for it to meet the standards established in the H.E.W. Guidelines. Under the guidelines, an enrollment of from 150 to 180 students in a minority situation by the fall of 1967 would be deemed satisfactory progress. Since no white students can be expected to request a transfer to Martin under the "freedom of choice" plan, all 150 to 180 would be Negroes enrolling at Altheimer. Overcrowding would be the result.[23] If overcrowding occurs, either individual white students will have to be assigned to Martin, one or more entire grades transferred to Martin, or the appellants' suggestion of using one site for elementary classes and the other for secondary classes adopted. Any of the alternatives will be difficult, for there will be little, if any, time for planning and preparation. This difficulty would have been avoided if the appellee School District based its construction plans on factors other than a desire to preserve a dual school system.

We would add that the lower court should have recognized the problems inherent in the Board's construction plans and required them to be modified to meet constitutional standards. Undue reliance on the "deliberate speed" language in the *Brown* case, plus adherence to the dictum in *Briggs*, has resulted in a decision which makes it more difficult to achieve a non-racially operated school system.

 It is clear that school construction is a proper matter for judicial consideration. Wheeler v. Durham City Board of Education, 346 F.2d 768 (4th Cir. 1965); Board of Public Instruction

---

22. During direct examination, the superintendent said:

"Q. All right, now, isn't it logical that from your experience as a Superintendent of Schools and your conversations with other school superintendents to assume that over the long run it will be Negro pupils choosing to go to white schools rather than the other way around?

"A. It is logical that that would be the case, yes."

23. The H.E.W. Guidelines state:

"In districts with a sizable percentage of Negro or other minority group students, the Commissioner will, in general, be guided by the following criteria in scheduling free choice plans for review:

(1) If a significant percentage of the students such as 8 percent or 9 percent, transferred from segregated schools for the 1966–67 school year, total transfers on the order of at least twice that percentage would normally be expected.

(2) If a smaller percentage of students, such as 4 or 5 percent, transferred from segregated schools for the 1966–67 school year, a substantial increase in transfers would normally be expected, such as would bring the total to at least triple the percentage for the 1966–67 school year.

(3) If a lower percentage of students transferred for the 1966–67 school year, then the rate of increase in total transfers for the 1967–68 school year would normally be expected to be proportionately greater than under (2) above. § 181.54 'Requirements for Effectiveness of Free Choice Plans,' Revised Statement of Policies for School Desegregation Plans under Title VI of the Civil Rights Act of 1964, December, 1966, as amended for the School Year 1967–68. See Part 80 of Title 45, Code of Federal Regulations (45 C.F.R. Part 80)."

of Duval County, Fla., et al. v. Braxton et al., supra, 326 F.2d at 620. It is also clear that new school construction cannot be used to perpetuate segregation. In Wheeler v. Durham City Board of Education, supra, 346 F.2d at 774, the Court stated:

"From remarks of the trial judge appearing in the record, we think he was fully aware of the possibility that a school construction program might be so directed as to perpetuate segregation. * * *"

Relying upon *Wheeler*, the District Court in Wright v. County School Board of Greenville County, Va., 252 F.Supp. 378, 384 (E.D.Va.1966) said:

"This court is loathe to enjoin the construction of any schools. Virginia, in common with many other states, needs school facilities. New construction, however, cannot be used to perpetuate segregation. * * *"

■ We conclude that the construction of the new classrooms by the Board of Education had the effect of helping to perpetuate a segregated school system and should not have been permitted by the lower court.

The fact remains, however, that error or no, new elementary classroom buildings have been constructed on the two sites and a plan which permits the best possible use of existing facilities in a constitutional manner must now be devised.

## TRANSPORTATION

■ The Board of Education transports rural students to and from their homes precisely as it did during the many years it operated a segregated school system. It was inefficient and costly then. It is just as inefficient and costly now. Running two school buses down the same country road, one to pick up and deliver Martin students and the other to pick up and deliver next door neighbors attending Altheimer, is a luxury that this impoverished school could not afford in the past and cannot afford now. The difference is that, before

*Brown*, the Board had the same right to operate segregated school buses as it had to operate segregated schools. While we have no authority to strike down transportation systems because they are costly and inefficient, we must strike them down if their operation serves to discourage the desegregation of the school system.

It has been said that the school bus is a principal factor in perpetuating school segregation in many areas of the South. See, United States et al. v. Macon County Board of Education et al., supra; Franklin v. Barbour County Board of Education, 259 F.Supp. 545 (M.D.Ala.1966); Harris v. Crenshaw County Board of Education, 259 F.Supp. 167 (M.D.Ala. 1966); Carr v. Montgomery County Board of Education, 253 F.Supp. 306 (M.D.Ala.1966); Harris v. Bullock County Board of Education, 253 F.Supp. 276 (M.D.Ala.1966); Wright v. County School Board of Greenville County, 252 F.Supp. 378 (E.D.Va.1966).; 53 Va.L. Rev. 82 (1967); 1 Racial Isolation in the Public Schools, a report of the United States Commission on Civil Rights (1967), p. 67.

■ Reasoning compels a finding that the school bus is so being used here. Neither students nor adults can be expected to interpret the Board's action in continuation of this expensive and inefficient system as being anything other than an act designed to maintain, insofar as it is possible, the segregated transportation of students. While we approve, at this time, the right of students to select the school that they desire to attend, we do not approve of their right to select the bus in which they ride to school. The appellee School District has an obligation to operate its buses on a non-racial basis and we do not believe it has done so.

We are not confronted here with a situation in which the appellee School District is being asked to bus children from one neighborhood to another to overcome the effects of defacto segregation, caused by racially segregated housing patterns, thus Downs v. Board

of Education of Kansas City, 336 F.2d 988 (5th Cir. 1964), cert. denied, 380 U. S. 914, 85 S.Ct. 898, 13 L.Ed.2d 800 (1964); Springfield School Committee v. Barksdale, 348 F.2d 261 (1st Cir. 1965); Bell v. School City of Gary, Ind., 324 F.2d 209 (7th Cir. 1963), cert. denied 377 U.S. 924, 84 S.Ct. 1223, 12 L. Ed.2d 216 (1964), are not applicable. See also, Board of Education of Oklahoma City Public Schools et al. v. Dowell et al., supra; Davis v. Board of School Commissioners of Mobile County, 364 F.2d 896 (5th Cir. 1966).

## THE REMEDY

The policies and practices of the appellee School District with respect to students, faculty, facilities, transportation and school expenditures have been designed to discourage the desegregation of the school system, and have had that effect.

The decision of the District Court dismissing the appellants' Complaint is, therefore, reversed and remanded for action consistent with this decision. The District Court shall retain jurisdiction to insure that the appellee School District carries out a detailed plan for the operation of the school system in a constitutional manner so that the goal of a desegregated school system is rapidly and finally achieved. When the goal is achieved, the District Court may relinquish jurisdiction, and the appellee shall be relieved of its obligation to file the reports on plans required by this decision with the District Court.

The plan approved by the District Court shall be consistent with, and in no event less stringent than, the one set forth in the H.E.W. Guidelines, heretofore accepted by the appellee School District. The plan, if the trial court desires,

may be identical to that set forth in the guidelines. In any event, the plan, including the sections of the guidelines adopted by the court, shall be embodied in a decree and shall contain, in addition to the matter previously referred to, provisions incorporating the requirements set forth below. Annual reports shall be filed with the Clerk of Court and served on the opposing parties thereto no later than April 15, of each year, provided that an initial report shall be filed no later than October 31, 1967. Such reports shall be in a form prescribed by the District Court, and shall contain such information as the court feels necessary to enable it to determine whether the Board is complying with the decree.

## STUDENTS

 The use of the "freedom of choice" plan, as outlined in the guidelines and as accepted by the appellee School District, is approved and may be used unless and until it becomes clear that the school system cannot be desegregated under such guidelines.

Uniform standards shall be developed for use in determining whether a class or school is overcrowded, and for use in determining the distance from home to school.

## FACULTY

The faculty shall be completely desegregated no later than the beginning of the 1969–70 school year.[24] To this end:

(1) Vacancies at Altheimer shall, when possible, be filled by the employment of qualified and competent Negro classroom teachers for such vacancies and, at Martin, by the employment of qualified and competent white classroom teachers for such vacancies.

24. In Board of Education of Oklahoma City Public Schools et al. v. Dowell et al., Civil No. 8523, 10th Cir., 1967, 375 F. 2d 158, the Court followed the recommendation of education experts hired by the plaintiffs and set the beginning of the 1969–70 school year as a target date for having "the same approximate percentage of non-white teachers in each school as there now is in the system." The same formula was followed in Kier v. County School Bd., 249 F.Supp. 239, 247 (W.D. Va.1966). While we impose no exact formula in this case, we call the above formula to the attention of the parties and the District Court as one which comports with Brown. See also, Robinson v. Shelby County Board of Education, Civil No. 4916 (D.C.W.D.Tenn. January 19, 1967).

(2) Immediate steps shall be taken by the appellee School District to encourage full-time white faculty members to transfer from Altheimer to Martin, and full-time Negro faculty members from Martin to Altheimer.[25] If sufficient volunteers are not forthcoming, the appellee School District shall assign a significant number of Negro classroom teachers to Altheimer for the school year 1967–68, and a larger number for the 1968–69 school year. The appellee School District shall also assign additional white classroom teachers to the Martin School for each of the above years. An equitable distribution of the teachers with advanced degrees shall be considered in making said transfers.

(3) Should the desegregation process result in the closing of either school, or the shutting down of a particular grade in either school, displaced personnel shall, at the minimum, be absorbed in vacancies appearing in the system.

(4) Inequalities between white and Negro teachers with respect to salaries and teaching load based on racial considerations shall be eliminated.

### TRANSPORTATION

The existing transportation plan shall be discontinued at the end of the present school year, and a new plan inaugurated consistent with this opinion.

### CONSTRUCTION AND USE OF FACILITIES

(1) Plans for the construction of additional facilities shall be submitted to the District Court for approval. Any new facilities shall, consistent with the proper operation of the school system, be designed and built with the objective of eradicating the vestiges of the dual system and of eliminating the effects of segregation.

(2) Students at Martin shall be permitted to make reasonable use of library facilities at Altheimer until such time as equal facilities at Martin School are provided.

### SCHOOL EQUALIZATION

(1) The appellee School District shall take prompt steps: (a) to provide library facilities for the Martin School which are substantially equal to those at Altheimer, (b) to equalize pupil-teacher ratios and pupil-classroom ratios between the Martin and Altheimer Schools, and (c) to secure a prompt accreditation of the Martin School equal to that currently held by Altheimer School.

(2) By October of each year, the appellee School District shall serve on the opposing parties, and file with the Clerk of Court, a report showing pupil-teacher ratios, pupil-classroom ratios, and teacher expenditures both as to operating and capital improvement costs; and, if there are any substantial differences between Martin and Altheimer Schools, the appellee School District shall outline the steps which it will take to eliminate said inequalities and state the time it will take to eliminate them.

### H. E. W. GUIDELINES

Nothing in this opinion shall be considered as relieving the appellee School District of any obligations that it has under the Civil Rights Act of 1964, including the responsibility of complying with the H. E. W. Guidelines, which they have voluntarily agreed to follow. To the extent that this opinion may constitute approval of said guidelines, it is not intended to deny a day in court to any person in asserting any individual rights or to

---

25. This requirement is not to be taken as in any way diminishing the responsibility of the Board of Education to desegregate the faculty in the event volunteers are not forthcoming. The Supreme Court in Brown v. Board of Ed. of Topeka, 349 U.S. 294, 299, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955), said:

"Full implementation of these constitutional principles may require solution of varied local school problems. School authorities have the primary responsibility for elucidating, assessing, and solving these problems; court will have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles. * * *."

the Board of Education in contesting any section of the H. E. W. Guidelines.

Reversed and remanded for action consistent with this decision.

On Petition for Rehearing

PER CURIAM.

Appellees' petition for rehearing en banc or by a panel of the Court is denied. After a careful review of appellees' petition and facts of the case, we are of the opinion that the decision is not in conflict with earlier decisions of this Court, and follows decisions of the United States Supreme Court.

The appellees do not specifically complain of the decision insofar as it relates to transportation policies, school facilities or faculty. They do object to the decision as it relates to students.

With respect to students, this Court rejected the appellants' request that we require immediate and total integration of the school systems by converting one of the schools into a high school and the other into an elementary school, and held that appellee School District could continue the use of the "freedom of choice plan" previously accepted by it unless and until it becomes clear that the school system cannot be desegregated under such a plan.