Moses KELLEY, on behalf of himself and his minor children, Moses Kelley, Jr., Katie Bell Kelley, and Lillian Kelley et al., Plaintiffs,

v.

The ALTHEIMER, ARKANSAS PUBLIC SCHOOL DISTRICT NO. 22, a public body corporate; and J. E. Stowers d/b/a the J. E. Stowers Construction Company, Defendants.

No. PB–66–C–10.

United States District Court
E. D. Arkansas,
Pine Bluff Division.

March 24, 1969.

John W. Walker, Little Rock, Ark., for plaintiffs.

Robert V. Light, Little Rock, Ark., for defendants.

Memorandum Opinion

HENLEY, District Judge.

On July 29, 1968, this Court filed a memorandum opinion and entered a decree in subject case which permitted the defendant District to continue to operate during the 1968–69 school year under the freedom of choice method of student assignment but directing the District to file not later than November 1, 1968, a further plan for the disestablishment of the existing dual school systems wherein one school complex is readily identifiable as a Negro school system and the other is readily identifiable as a predominantly white school system. Reference is now made to that opinion for a rather full history of the litigation. Reference is also made to the opinion of the Court of Appeals for this Circuit reversing this Court's original decision in this case. Kelley v. Altheimer, Arkansas Public School District No. 22, 8 Cir., 378 F.2d 483.

The Court's opinion of July 29 was written in the light of the ruling decisions of the Supreme Court of the United States in Green v. County School Board of New Kent County, Va., 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716; Raney v. Board of Education of Gould School District,[1] 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727; and Monroe v. Board of Commissioners of City of Jackson, Tenn., 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733.

■ ■ Those three decisions make it unmistakably clear that freedom of choice is not a constitutionally tolerable method of ending racial segregation in the public schools of a district unless it is capable within a short period of time of disestablishing dual school systems, and that it is not constitutionally acceptable in a particular district, like Gould, where it is bringing about nothing but a token desegregation of a formerly all white school system while leaving the other system still clearly identifiable as a Negro system.

In its memorandum opinion the Court pointed out that as of the time of the opinion freedom of choice at Altheimer had not disestablished the dual school system; that under the District's projections for the 1968–69 school year only about five percent of the enrollment in the formerly all white system would be Negro, and that no white students would be in attendance in the Negro Martin School complex. The Court implied rather strongly that it doubted that freedom of choice would ever work at Altheimer and recommended that the Board consider available alternatives.

In its decree the Court mandatorily enjoined the District "promptly to disestablish the existing dual system of racially identifiable public schools in said District and to replace the same with a unitary system in which no schools can be identified as 'Negro' schools and in which no schools can be identified as 'white' schools." [2]

On October 31, 1968, the District filed a Report in which it reiterated its desire to continue to operate under freedom of choice but stated, as an alternative, that if not permitted to do so, it would restructure the school system so that students enrolled in grades one through eight will be assigned to the Martin (Negro) complex and so that students

---

1. The Gould School District is located in Lincoln County, Arkansas; the defendant District is located in Jefferson County which borders Lincoln County. Conditions prevailing in the defendant District are quite similar to those prevailing in the Gould District which were considered by the Supreme Court in the cited case.

2. Plaintiffs appealed from so much of the Court's decree as permitted the District to operate under freedom of choice during the current school term. However, the appeal was not pressed and was dismissed by plaintiffs so as to clear the way for the Court to act with respect to the District's plan about to be described in the text.

enrolled in grades nine through twelve will be assigned to the Altheimer (formerly all white) complex. It was stated that due to the proximity of the two school complexes and to residential patterns existing in the District residential zoning for school assignment purposes is not practical.

The prayer of the Report is that "the Court approve the freedom of choice procedure for assignment of students during 1969-70. In the alternative, defendants pray that the Court direct the alternative procedure that will be adopted."

In the body of the Report the District states that after school opened in September 1968 it polled the school patrons as to their attitudes toward freedom of choice and with respect to certain other questions. The same questions were asked both white and Negro patrons. Negro patrons were interrogated by Negro employees of the District and white patrons were interrogated by white employees of the District.

According to the Report, including Exhibit A thereto, the poll revealed that an overwhelming majority of both white and Negro family groups in the District favored a continuation of freedom of choice and were satisfied with the existing organization and structure of the District. The poll also revealed that if the District's schools should be completely integrated the children of a majority of the white patrons of the District would cease to attend the District's schools, and that to keep their children out of the District's schools 70 out of 98 white families would be required to leave the District. The poll finally reflected that white attitudes would not be significantly affected by an assignment procedure geared to curriculum paces which different students might be able to maintain. The Report also alleged that the possibility of a restructuring of the District's schools had caused certain staff losses, and it was pointed out that the Superintendent who had been with the District for many years had resigned effective November 1, 1968, that the act-

ing Superintendent who was to succeed him had resigned, effective June 30, 1969, and that since May 1968 six white teachers had resigned.

In due course the plaintiffs responded to the Report and objected to its approval.

Neither side has desired an evidentiary hearing in connection with the Report. For the express purpose of avoiding the necessity of such a hearing counsel on both sides on February 26, 1969, filed a Stipulation to the effect that if a hearing were held, the evidence would establish certain facts, to-wit:

"1. That if defendants are required to abandon the freedom of choice method of student assignment and restructure the system so that grades one through eight are taught at one school complex and grades nine through twelve are taught at the other, then the following things which are beyond the power of the school Board to control will possibly occur.

    a. The majority of the white students will be withdrawn from the system.

    b. The vast majority of the white faculty members will decline further employment in the system.

    c. It will be difficult, if not impossible, to recruit and employ new white teachers to replace those that leave.

    d. No particular difficulty would be encountered in recruiting and employing new Negro teachers.

    e. There will be an attrition among those white students and teachers who remain in the system in September, 1969, so that within a few years all of the white students and teachers will have left the district.

    f. The value of real property in the district (especially residential and commercial) would fall thereby reducing the tax base upon which the district obtains

a large portion of its operating revenue.

g. As they withdraw their children from the system, the white patrons will withdraw their support from the public schools.

"2. There is an educationally significant disparity in the average achievement level of the Negro students and the white students in the district.

"3. There is a significant disparity in the average educational and socioeconomic levels of the Negro and white patrons of the district.

"4. That a large number of the school districts in Arkansas have either no Negro students or so few Negro students that they have long since been assimilated into a single unitary school system without significant difficulty.

"5. That the United States Commission on Civil Rights concluded, and has reported in its official government publication, that throughout the nation, in the North, South, East and West, and in the urban, suburban and rural areas, as the proportion of Negro students in a public school approaches 50% there is a tendency for it to rather quickly convert to an all-Negro school.

"6. That plaintiffs in the suit now pending in this Court before another District Judge against the Little Rock School District, represented by the same counsel as plaintiffs in this case, are urging that residential zoning cannot effectively desegregate the Little Rock School System, and that the schools must be racially balanced.

"7. That the Gould School District in Lincoln County, Arkansas is the only school district in Arkansas ordered by the federal courts to abandon freedom of choice and restructure its school system since the May 27, 1968, decisions of the Supreme Court so

that one school (previously offering grades one through twelve) is a high school and the other school (also previously offering grades one through twelve) is an elementary school. When the 1967–68 school year ended there were 307 white students and 587 Negro students attending the Gould system. As of October 30, 1968, there were 75 white students and 557 Negro students attending the Gould system."

As indicated, the District contends that in the circumstances it should be permitted to continue to operate under freedom of choice although it concedes that restructuring of the schools so as to produce a unitary school system is feasible physically. The position of the plaintiffs is that the facts relied on by the District and covered by the stipulation are irrelevant, and that the schools must be restructured regardless of the wishes of the patrons and regardless of the effect that such action will have on the population of the District or on the District's educational program.

It will be observed that the stipulation of the parties consists in part of statements of existing facts which the Court finds from the stipulation to exist. The stipulation also consists in part of what amount to predictions of what will happen if the schools of the District are integrated.[3]

As to the predictions, no one knows positively at this time what will happen if and when the District's schools are integrated. Perhaps the predictions are at least reasonably accurate. It may be true that if the schools at Altheimer are integrated, as many white parents as find themselves able to do so will remove their children from the District's schools, at least for a time, and that temporarily at least the existing dual school system will be replaced by a unitary system which will be predominantly Negro and which will be staffed by predominantly Negro administrators and teachers.

3. At this juncture the Court may as well use the term "integrated" rather than the more euphemistic term "desegregated."

It can be, and indeed has been, argued cogently that even if whites do not leave the situation which will be produced by the integration of the schools of a district such as Altheimer is educationally undesirable. It is clear, however, that in the progressive development of the socio-constitutional doctrine laid down by the Supreme Court in the *Brown* decisions of the mid-1950's purely educational considerations cannot be used by public school districts as valid bases for failing or refusing to carry out their mandatory duty to abolish dual systems of racially identifiable schools.

It will be recalled historically that for several years following the *Brown* decisions certain Arkansas school districts sought to solve their racial problems by applying to Negro students desiring to attend formerly all white schools certain assignment criteria and placement standards which appeared to be in and of themselves educationally sound and unobjectionable. The conflict between those criteria and standards, on the one hand, and the constitutional rights of Negro students, on the other hand, came into focus at a fairly early stage of the litigation involving the Dollarway School District in Jefferson County. The conflict was resolved in favor of the constitutional rights of the students in Dove v. Parham, 8 Cir., 282 F.2d 256. Speaking for the Court then Chief Judge Johnsen had this to say (pp. 258–259 of 282 F.2d):

"Standards of placement cannot be devised or given application to preserve an existing system of imposed segregation. Nor can educational principles and theories serve to justify such a result. These elements, like everything else, are subordinate to and may not prevent the vindication of constitutional rights. An individual cannot be deprived of the enjoyment of a constitutional right, because some governmental organ may believe that it is better for him and for others that he not have this particular enjoyment. The judgment as to that and the effects upon himself therefrom are matters for his own responsibility.

"In summary, it is our view that the obligation of a school district to disestablish a system of imposed segregation, as the correcting of a constitutional violation, cannot be said to have been met by a process of applying placement standards, educational theories, or other criteria, which produce the result of leaving the previous racial situation existing, just as before. Such an absolute result affords no basis to contend that the imposed segregation has been or is being eliminated. If placement standards, educational theories, or other criteria used have the effect in application of preserving a created status of constitutional violation, then they fail to constitute a sufficient remedy for dealing with the constitutional wrong.

"Whatever may be the right of these things to dominate student location in a school system where the general status of constitutional violation does not exist, they do not have a supremacy to leave standing a situation of such violation, no matter what educational justification they may provide, or with what subjective good faith they may have been employed. As suggested above, in the remedying of the constitutional wrong, all this has a right to serve only in subordinancy or adjunctiveness to the task of getting rid of the imposed segregation situation.

"That was the basis on which we held in our previous opinion, 271 F. 2d at page 137, that the District was entitled to a use of the placement or assignment statute in relation to its desegregation task, when we stated that the statute was being accorded recognition 'only as an implement or adjunctive element * * * for effecting an orderly solution to its (the District's) desegregation difficulties, in proper relationship to its other school-system problems, but with a subservience to the supreme-law dec-

laration of the Brown cases as to all imposed segregation and the obligation owed to get rid thereof within the tolerance entitled to be allowed play under these decisions for accomplishing that result.' "

The Dollarway School District is still involved in litigation, and in its latest pronouncement in that litigation the Court of Appeals affirmed the order of this Court commanding that District to disestablish its dual school system, which order was based on a finding that freedom of choice had not been and would not be a sufficient means of eliminating racial discrimination in the schools. Cato v. Parham, 8 Cir., 403 F.2d 12. And the Dollarway District has now filed with the Court a pupil assignment plan based on residential zoning, the sufficiency of which plan is yet to be passed upon by the Court.

■ In order to rule in the instant case, however, it is not necessary for the Court to make comparisons between the Altheimer situation and the Dollarway situation or between the Altheimer situation and the situation at Gould which was considered by the Supreme Court of the United States. This is true because the Court of Appeals for this Circuit has made it clear that the dual system at Altheimer must be disestablished. Kelley v. Altheimer, Arkansas Public School District No. 22, supra. And in that decision the Court of Appeals recognized that restructuring of the system is a feasible alternative to freedom of choice.

Assuming that the poll conducted by the District accurately reflects the true feelings of the patrons of the District, both white and Negro, the Court would certainly not be unwilling to follow the wishes of a majority of the people directly affected by whatever order the Court may make herein. From what has been said, however, it is evident that integration of the public schools, at least in this part of the country, is no longer a matter of local option.

In view of the present state of the law and in view of the history of this case and of the manifest failure of freedom of choice to disestablish the dual school system which has existed in the District, this Court cannot legally justify permitting the District to continue to operate under the freedom of choice method of assignment, particularly in the light of the fact that the District itself does not now appear to contend that that method will in the foreseeable future, if ever, bring about the integration of the schools which is required.

One of the issues in the case has been the integration of staff and faculty. The Court believes that that particular problem will in all probability take care of itself automatically when the schools are restructured. That is to say, elementary teachers both white and Negro who remain in the employ of the District will teach both white and Negro elementary students, and high school teachers who remain in the employ of the District will teach both white and Negro high school students. And administrative and supervisory personnel of the District will deal with students of both races.

■ In closing this memorandum the Court will admonish the District that even after the schools are restructured the District may find itself charged with discrimination if it undertakes to assign pupils and teachers to rooms and classes in such a manner as to create racial segregation within the restructured system. And, the District must be careful to avoid racial discrimination in its employment and employee termination policies and practices.

■ A decree will be entered commanding the District to restructure its schools in the manner which has been described and to refrain from discrimination in the operation of the restructured system. Since the District was not willing voluntarily to abandon freedom of choice and restructure its schools although the feasibility of the latter

course has been obvious, the Court holds that an additional attorney's fee should be awarded to counsel for plaintiffs and now fixes that fee in the amount of $500. Jurisdiction of the case will be retained for any and all appropriate purposes.